# CARRIE E. COBURN

## *vs.*

## ELENORA J. SHILLING, ADMINISTRATRIX.

*Savings Bank Deposit—Declaration of Trust—Confidential Relations.*

An order by decedent to a savings bank directing in terms that an account be opened in his name in trust for himself and his niece, joint owners, subject to the order of either, the balance after the death of either to belong to the survivor, *held*, in view of the evidence, to have been intended not to create a trust in favor of the niece, but merely to enable the latter to draw out money for the convenience of decedent.                p. 198

Where decedent, a man eighty-two years of age, while desperately ill, was removed at his request to the residence of his niece, a trained nurse, who had previously transacted many of his business matters because of his confidence in her, *held* that confidential relations existed between the parties, imposing upon the niece the burden of showing not only that a gift to her by decedent was his voluntary act uninfluenced by her, but also that he had the benefit of competent advice and understood what he was doing.                p. 199

That an administratrix was not, as such, a party to an interpleader proceeding involving the ownership of a fund, *held* not an obstacle to a decree directing the payment of the fund to her as administratrix, she being a party to the proceeding in her own right and the court deciding that she had the beneficial interest therein, and that the legal title was in the estate.  p. 200

*Decided March 3rd, 1921.*

Appeal from the Circuit Court of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, ADKINS, and OFFUTT, JJ.

*John L. G. Lee,* with whom was *Fred L. Coburn* on the
brief, for the appellant.

*William H. Lawrence,* with whom was *John Wm. Farrell*
on the brief, for the appellee.

ADKINS, J., delivered the opinion of the court.

This is a contest between Carrie E. Coburn, the niece, and
Elenora J. Shilling, the daughter of Joseph Dunn, deceased,
for the possession of a savings bank deposit.

On November 25th, 1919, the Hopkins Savings Bank of
Baltimore filed a bill in interpleader in which it is alleged:

That on March 31st, 1919, a money deposit account was
opened with said bank in the name of Joseph Dunn and a de-
posit book was given therefor, which account on September
26th, 1919, amounted to $1,840; that on or about Septem-
ber 25th, 1919, the defendant, Carrie E. Coburn, came to
the bank and stated to one of the tellers that the said Dunn
desired that she should have the right to withdraw funds
from the said account; that she was told what was the cus-
tomary form of such an account, and that the effect was not
only to make it subject to the order of either of the named
persons, but to entitle the survivor to the balance standing to
the credit of the account upon the death of either of the joint
owners; that she then declared that the said Dunn did not
intend that such balance should belong to her in the event of
his death but to his daughter, the defendant, Elenora J.
Shilling, and only meant her, the said Carrie Coburn, to have
the right to withdraw funds from said account for his use
and benefit during his lifetime and not for her own use and
benefit either during his lifetime or after his death; that
notwithstanding said declaration, the said Carrie Coburn
procured from the bank a signature card in the trust form for
joint owners, and on September 26th, 1919, presented to the
bank a signed order from the said Dunn directing the account
then standing in his name to be withdrawn, and a new ac-
count to be opened in the name of Joseph Dunn, in trust for

himself and Carrie E. Coburn, joint owners, subject to the order of either, the balance at the death of either to belong to the survivor, and filed with the bank signature cards for said account; that within a few days thereafter the said Dunn died and thereafter the said Elenora made claim to the balance of said account, and on the same or the next day the said Carrie demanded payment of it, and afterwards brought suit for the recovery of said deposit. The bill prays that said claimants be required to interplead.

Both answered; Elenora averring that the sole object of the said Dunn was to enable the said Carrie to draw out money when it was needed for his use, and that the said Carrie was a mere trustee for him and for the said Elenora, for whose use, upon his death, the fund was designed; and that she claims title to said fund by virtue of the trust in her favor, and also that she is the duly appointed administratrix of said decedent, he having died intestate; and Carrie averring that her claim is based upon a deposit book of said bank, and upon certain relationships with said Dunn. The Circuit Court of Baltimore City passed an order that Carrie E. Coburn be made party plaintiff and Elenora J. Shilling be made party defendant in said case, whereupon proper pleadings were filed by the parties reasserting their respective claims, and testimony was taken.

It appears from the testimony that Joseph Dunn was taken sick at his rooms on Hanover Street about two weeks before his death with bilious dysentery, and that three days before he died he was taken to Mrs. Coburn's home on Fulton Avenus by her mother, Mrs. Taylor. In this home, besides Mrs. Coburn and Mrs. Taylor, were Mrs. Coburn's daughters, Mrs. Caldwell, and her grand-daughter Mrs. Joyner. The doctor testified that from the first he was critically ill and that in addition to dysentery he had arterio-sclerosis; that his mind was apparently clear; that he talked rationally about his illness; did not talk with him about business affairs. Witness advised Mrs. Coburn the first day at her house that her

uncle was critically ill, and did not think he could have told her, as she testified, that he would likely pull through. The dooctor had not known him before these visits.

Mrs. Coburn testified that when her uncle's second wife died, in March, 1919, he came to her house in great distress and she went to his rooms and prepared her body for burial. "While I was getting her clothes, I found, wrapped in a towel, a shot bag. I felt it and it felt like it had money in it. I took the bag from the drawer, and unwrapped it from the towel; and I went to Uncle Joe and showed him the bag. When I opened the bag, I found rolls of money in it in rolls of $100 each. I think there were $2,000 in that bag." This money was deposited in the Hopkins Place Savings Bank; witness advised him to deposit it there and went with him to the bank; this was about March 31st, 1919; it was deposited in his own name; her mother had an account there. The witness further testified that on September 25th, 1919, at her uncle's request, she wrote and presented to the teller at the bank the following paper:

"I, Joseph Dunn, would like my account that was placed in the Hopkins Place Savings Bank, March 31, 1919, changed to be paid or drawn jointly to or by my niece, Mrs. Carrie E. Coburn, 1636 N. Fulton Avenue, Baltimore, Md., and myself.

"Joseph Dunn."

In reference to this order witness was asked on cross-examination: Q. "Don't you remember telling him (the teller) that you wanted the money placed in your uncle's name and your name, and he asked you why,—if you were the only surviving heir, and don't you recall saying to him, 'I am not his only survivor, he has one child; but he wants the money put in my name so that he can withdraw it from time to time, and that the balance is to go to his daughter (Mrs. Shilling); and the reason why he does not want to put it in her name is so that her husband can't get possession of it'? (The Court): Did you make the statement in question to the gentle-

man at the bank    A. Yes, sir.    Q. You remember telling him that you were not his only survivor, that he had one daughter, that he wanted the money deposited in your name so he could withdraw it from time to time, and that the balance was to go to Mrs. Shilling, but that he did not want it in her name so that her husband could not get possession of it?   A. No, sir, I didn't say that, that is not the way I said it.   I went to the bank, and my daughter was with me.   I went to the bank and presented the order and the bank book. I said that my uncle,—he read the order before I said anything, then he said 'This is drawn up in good form; but your uncle will either have to come down here himself or sign some papers that I will give you.'   Then he said: 'Why does he want this changed this way?'   I said, 'Because he wants it changed so that I can draw it whenever he wants it drawn.' Then he said, 'Why don't he come down himself?'   I said, 'Well, he is sick and can't come down now.'   Then he said, 'Are you his only heir—has he any other relatives?'   I said, 'No, he has a daughter.'   Then he said, 'Why don't he want it turned over into his daughter's name?'   I said, 'Because he don't want her to know anything about this money, and he don't want her to have anything to do with it; and another thing, her husband is a drunkard and never has supported her; and another thing was that she had never done anything for him.'   Q. (The Court): What did you ever notice there about Mrs. Shilling?   A. There was no congeniality.   Q. Did you ever see her do anything for him?   A. Yes, sir, on two occasions.   Q. What, if anything, did she do for him on these two occasions that you saw her there? A. She worked with me,—we both did things that time.   We both worked in the rooms,—cleaned and dusted the rooms. Q. Did you ever know her to go there except on these two occasions?   A. That I can't say—I don't know.   Q. How often did you visit your uncle?   A. One, two or three times a week.   I would go down in the morning and clean up for

him. * * * In the evenings he would come up to supper; nearly every Sunday Uncle Joe came up to my house to supper.' "

Witness further testified that her uncle signed the forms furnished by the bank and the account was changed to the trust form set out in the bill of interpleader on September 26th, 1919, about noon, and that her uncle died the same day at 4.25 p. m.

Speaking of her relations with her uncle after the death of his wife, Mrs. Coburn testified that he had no one to take care of him, and she used to go down there every week,— sometimes two or three times a week, and clean up for him; that she would clean up his home, change his beds, wash and iron his clothes; that before his wife's death, during the five years of their married life, she visited them probably seven times a year; that she knew her uncle's financial condition before the money was found, and had given him money.

It appears further from Mrs. Coburn's testimony on cross-examination that she filed a petition in the Orphans' Court on January 14th, 1920, in which she alleged that Mrs. Shilling was the illegitimate child of Joseph Dunn; that she advertised for the nieces of her uncle's deceased wife, "because I felt that, not having issue, they were her proper heirs, if I couldn't get the money which he wanted me to have."

Mrs. Carrie McC. Caldwell, the daughter of Mrs. Coburn, testified that she was at her mother's when Mr. Dunn was brought there; that the doctor said he was not critically ill, but that he needed quiet and care, and that he would pull through; that her mother is a trained nurse; that she was with her mother at the bank on both occasions mentioned by her; that Mr. Frey, the teller, said the order they first presented was all right but it was not sufficient to change the account; that he gave them two slips, marked them and told them to get Mr. Dunn to sign them, and to bring them back the next day; that when they showed them to Mr. Dunn he

was very much incensed because the bank had not accepted his order; that they didn't tell him about the slips until he had calmed down about a half or three-quarters of an hour later—"We showed him the slips and the place to sign"; that he signed them and said: "I hope that will be all right now." "Q. Did you read them to him? A. We didn't have to read them to him, he could read them himself. Q. You didn't read them to him? A. He read them himself."

Witness further testified that her uncle had a horse-radish stand in the Hanover Market for a number of years before his death and that he attended it up to a week before he died; that Uncle Joe said to her: "You know I have a little money in bank now, but don't mention it to the Shillings if they come here, I don't want them to know I have it"; that she said to him, "If Ellie and Charlie come here, Uncle Joe, I won't say anything to them about it, because it is none of my business." This witness's version of what took place at the bank is shown by the following questions and answers: "Q. When you went to the bank the second time, tell his Honor whom you saw? A. This gentleman who is in court. (Indicating Mr. Frey.) Q. That is this young man, Mr. Frey? A. Yes, sir, and another man came up a few minutes after we arrived. Q. Do you recall then whether Mrs. Shilling's name was mentioned? A. Not at first. * * * We passed the old book and the slips through the window, and this gentleman took them; and he said, 'Is this the way your Uncle Joe wishes it?' Q. He didn't say 'Uncle Joe,' did he? A. No, sir, he said Mr. Dunn. * * * He asked my mother if she was his only heir and mother said no, that there was a daughter. He wanted to know why he didn't want it turned over to the daughter, and mother said she had never been a daughter to him, that he didn't care for her to know that he had the money, that he didn't want her name on it because he didn't want her husband to get it, as her husband was a drinking man; and that both of them had been nothing to

him. While he was at the house nothing was said to him about putting it in his daughter's name, or about his son-in-law, because he seemed to be incensed, for some cause or other, against the daughter." The witness further testified that her uncle was not a man of means; that her mother helped him out, gave him money, on several occasions; that his attitude towards her mother and grand-mother and all their family was very affectionate.

Witness was asked what they did with the bank book after the account was changed, and she answered: "We went home to the house, and after we had been there about an hour,—after we had straightened up about Uncle Joe, attended to him, gave him his medicine and nourishment,—then mother took the bank book and gave it to him. He looked at it, and then said, 'That is all right, Honey, take this, it is yours and put it away.' At the time he seemed better, very much brighter; they were all in the room laughing and talking and he was conversing with them" "Q. Now, Mrs. Caldwell, what was your uncle's attitude towards Mrs. Elenora Shilling? A. To my mind it was very distant. * * * The first day that he was there my mother asked him if he wanted her to send for Mrs. Shilling, and he said that he did not. The first time that she came there, I said that she was there, and he simply said, 'All right.' He never addressed her in an affectionate way, and he never acted as affectionately towards her as he had towards us. Q. Do you know why your mother didn't turn the book over to him while Mrs. Shilling was there? A. Yes, sir; we had almost sworn on oath to him not to let her know he had the money. Q. This order was prepared by your mother, you knew that, didn't you? A. Yes, sir. Q. You were asked whether it was read to your uncle? A. He read it himself. A. But he didn't write it himself, did he? A. He asked her to write it, and I thought that was because he had palsy in his hands, and he was nervous. Q. He had palsy in his hands? A. I didn't say that he had palsy. I said that I thought he had it. Q. Who

dictated it? A. He did. Q. That is her own dictation? A. He told her what he wanted put into it. He saw her writing it, and he read it. Q. He read what she wrote? A. He read what she wrote out loud. Q. He said he had a little money, —did he make use of that expression,—that he had a little money in bank? A. I don't remember making that statement. Q. Don't you remember making a statement about him having money in bank? A. I remember making a statement about the bank book. Q. Did he say anything about having a little money in bank? A. No, sir."

Referring to witness's statement that her uncle said he didn't want to see Mrs. Shilling, this question was asked: "Q. As a matter of fact, you folks didn't want him to see her, did you. A. No, sir."

As a sample of the sort of testimony this witness gave in regard to the relations between Mrs. Shilling and her father, the following questions and answers are quoted: "Q. Now, I want you to tell his Honor,—you were cross-questioned by Mr. Lawrence about Mrs. Shilling kissing her father—I want you to tell the court what she said about her father just after he died? A. We were sitting in the bedroom just above where her father was laid out, and we were talking about him. She said, 'He never was a father to me, I never really believed he was my father.' I asked her why she thought that, and she said because her father had kept a bad house. Q. What do you mean by that? A. A house of ill fame, and his second wife was the mistress of it. That was when her father was lying dead." That she ever said any such thing was positively denied by Mrs. Shilling.

In view of the previous testimony of the witness, the following answers to questions by the court are somewhat remarkable: Referring to the visit to the bank on September 25th, the court asked: "Q. And then it was that you were given the blanks that would put it (the first order) in form, and you took them back to the house? A. Yes, sir. Q. When were they signed? A. The next morning. Q. Did you with-

hold them from him until the next morning? A. He knew that we had them. Q. He knew that you had them? A. Yes, sir. Q. When did you show them to him, about what time? A. It was some time after Uncle Joe was fixed and we had given him his nourishment,—then we got them. *He asked for them in fact."*

Mrs. Mary B. Taylor, Mrs. Coburn's mother, testified that she was eighty-five years old and Mr. Dunn, her brother, was eighty-two at the time of his death; that she lived with her daughter about fifteen years; that her brother frequently came to her daughter's house, almost always took dinner there on Sunday, and was very affectionate towards them all; that on the morning of September 24th, 1919, she found her brother sick in his room; "I went down there in the morning, and I seen he was in very bad condition. He asked me to take him up to Carrie's and I got a taxi. I got a taxi and took him there myself, and then I went for the doctor." "Q. What was Joe's condition when you got him home from Hanover Street? A. He was bad off. Q. When you saw him was he able to walk and get into the taxi? A. The man who drove the taxi helped him down into the taxi. I went there, I guess, between half past seven and eight o'clock in the morning. He was lying on the lounge. I rapped at the door and he managed to get it open for me, and he was so glad to see me. Q. What did he call you? A. He called me 'Sis.' I was his sister. Q. Did he have any trouble getting to the door? A. He was on the lounge right next to the door, and he dragged himself to the door. As soon as I got in, he said, 'Oh, take me up to Carrie's, I am so sick.' Yes, sir, he asked if I came down with the intention of taking him home. Q. He didn't say anything about taking him to Ellie Shilling's, did he? A. No, sir, he didn't want to go there. She never did anything for him,—she didn't treat him good. Q. What do you mean by 'Didn't treat him good,' tell us of some instances of how she treated him? A. He didn't like Mr. Shilling, and he didn't like the way that his daughter neglected

him. She very seldom went to see him. I remember one time for a whole year she never went near him. When his wife was sick she never went near him."

This witness testified that when Mr. Dunn's second wife died he came to Mrs. Coburn's and said he had nothing to bury her with, that he hadn't any money. "My daughter told him not to worry, as she would see that his wife was buried; she was buried from Mrs. Shilling's house."

On the subject of the bank book, her testimony was as follows: "Q. Did you see him give the bank book to Mrs. Coburn? A. Yes, sir. Q. Tell us as near as you can, what Joe did on the day that he died. If you can recall, tell us everything that happened as near as you can. A. The trouble seemed to be about having some papers fixed up at the bank —that seemed to be on his mind. Q. How did he want it fixed? A. He wanted to leave it to my daughter so that she could attend to everything, and she went to the bank with a note. It seems as if there was some trouble about it, and she brought a paper up for him to sign, and he signed it. Then, I think, she went back to the bank again. Q. Did you see him sign the papers? A. Yes, sir; I was in the room."

Then, in reference to what occurred after Mrs. Coburn and her daughter returned from the bank on September 26th: "Q. Did you see any bank books there then? A. She handed the book to him—she had it in her hand. He took it, looked at it, and gave it back to her. Q. Did you hear him say anything when he gave it to her? A. He told her, 'Keep that, that is yours, keep it.' Q. Do you know your brother's attitude towards Mrs. Shilling? A. I can only say this: whenever he would come up and I would ask him if Ellie had been up to see him, he would say, 'No.' Q. Did you ever see Ellie there at his place? A. Not while his wife was sick; but after she died, she was down there. I was down there, too."

This witness further testified about the work done by Mrs. Coburn cleaning up her uncle's rooms and washing for him.

At this point William Cook, the undertaker, was put upon the stand to testify as to the whereabouts of a Mr. Penn, one of his employees, who prepared the body of Mrs. Dunn for burial. "Q. Do you think he could be here tomorrow? A. I could not say, I don't know where he is. Q. He was here yesterday? A. Yes, sir. He disappeared last night, and his wife hasn't seen him. His wife telephoned me at one, three and four o'clock this morning to see whether I had heard anything from him."

This testimony is important only as a sidelight on the only witness who corroborates Mrs. Caldwell, the daughter of the appellant, in the statement that Mr. Dunn did not want his daughter to know anything about the money. Later on he appeared without a formal summons at the request of appellant and was examined out of order after appellee had begun her testimony. Penn said Mrs. Coburn arranged for the funeral and became responsible for the bill; that Mr. Dunn told him they were looking for the deed to the cemetery lot and "they found this big sum of money. He didn't know anything about it being in the house"; that Mr. Dunn counted out of this money enough to pay the funeral bill and paid it himself. "A lady and a gentleman were coming up the steps (I didn't know who they were at that time, but later learned that it was Mr. and Mrs. Shilling). He took the bag of money and sat on it, and said, 'I don't want them to know anything about the money.' They went into the kitchen and shut the door, and he told Mrs. Coburn, 'I don't want them to have anything to do with it, they are nothing to me. I don't want them to have any of it.'"

The remaining witness for the appellant was Mrs. Isaiah E. Joynes, her grand-daughter. Referring to the incident of the handing of bank book to Mrs. Coburn, Mrs. Joynes said: "Uncle Joe had just gotten up as I came by,—he had been using the commode. My grandmother handed him the book—he had just gotten off the commode, and I think he was sitting on the side of the bed, but I won't be sure about

that; but I know that he was sitting up in bed. My grandmother gave him the book, he looked it over, and he said, 'All right, Honey, take it and put it away.' Q. Did you talk to your uncle any on the day that he died? A. Yes, sir, while I was sitting there in his room before he died. Q. What was his talk about? A. He only smiled,—I asked him how he was, and he said he felt all right,—that was the only answer that I got from him." On cross-examination this witness varied her direct testimony as to what Mr. Dunn said when he handed the book to Mrs. Coburn by making it: "It is all, Honey, take it and put it away." She happened to be passing the door at the time and heard this.

Mrs. Elenora Shilling, testifying in her own behalf, said she was forty-seven years old and lived with her husband and two children and her mother-in-law. Joseph Dunn was her father. The two other children of her father were both dead. Her mother died fourteen years ago. She lived with her parents until she was married at the age of eighteen and afterwards until her son was two years old. Three of her children died while she was living with him. Her father lived with her eight or ten years after her mother's death. "Q. After your stepmother died, did you visit you father? A. I did. I visited him regularly. I went over there, visited him and did what I could so far as he would let me. He was very independent. I offered him a home right after his second wife died, and he stayed there for about a month. Q. Why didn't he remain with you? A. Because he had his busines to attend to, and it was too far away from his place of business."

The family bible was offered and a certificate of the minister showing the marriage of Joseph Dunn and Miss Elizabeth Jane Kerner on January 1st, 1862. The bible shows the dates of the birth and death of the other members of the family and the birth of Mrs. Shilling on November 27th, 1873. Her middle name is Joetta, after her father. Their relations were always affectionate. After her father married

his second wife she visited him every week while they lived on Milton Avenue; she and her father never met without embracing each other.

(The Court, referring to her stepmother's funeral): "Q. What part did you take in the funeral arrangements? A. He came to me on Sunday morning and told me that his wife,—he addressed her as my mother, was dead. He said, 'Will you come down,' and I said that I would. I went down. Before she was married I called her 'Cousin May,' and afterwards 'Ma.' She was buried from my home. Q. Do you know anything about this money that is the subject of this inquiry here? A. I knew that my father had money. I never knew him to be without money. He was independent, and never asked alms from anyone. Q. He worked always? A. He was in the market from the time he was fourteen years old. Q. This eighteen hundred dollars, did he know he had a bank book? A. I knew that he had a bank book. When his second wife died, he came home and said, 'Ella——' "

At this point witness was interrupted and told not to tell what her father said. Apparently she was about to repeat something said to her by her father in reference to the bank book, which was testified to by her husband later.

She said she had talked with Mrs. Coburn about it after her father's death. Mrs. Coburn said, "Ella, do you know what your father has?" I says, "No, no more than you do." She said, "It is not a fortune,—he has some money, but it is not a fortune. When you get it, you put it away,—you know you never had anything. You put it away." (Mrs. Coburn testified in rebuttal, but did not deny this.) "Q. You say that the relations between you and your father were pleasant? A. Yes, sir, Q. Do you know where your father was taken from Hanover Street? A. Yes, sir, to Mrs. Coburn's. Q. Were you advised of that? A. No, sir, I went down on Monday,—I went down to clean up and I came home. Then I went down the second time and I missed him. I asked the gentleman at the commission house if he had

seen Mr. Dunn, and he said he had, that an elderly lady——
(The Court): As a result of your visit to Hanover Street,
you learned that your father was not there? A. Yes, sir.
Q. You went to visit your father? A. Yes, sir, and to clean
up. Q. How often did you visit him? A. Sometimes twice
a week, and sometimes oftener. Q. What would you do? A.
I would clean and scrub up, carry his clothes home, wash,
iron and patch them; and then bring them back to him. Q.
When he was taken away, you knew nothing about it? A.
No, sir. Q. And you were making your usual call? A. Yes,
sir. Q. Your husband telephoned. What time did he get
there? A. In the morning I went up. I went towards
father and he seemed to be glad to see me, and I caressed
him the same as he did me."

She remained there until late that night—until half past
seven or eight o'clock and returned the next morning and re-
mained till after the funeral. "He was right bad off, couldn't
move much, only once in a while. He hardly spoke at all.
He received her very affectionately. I kissed him, and he
caressed me the same as he always did." "Q. What happened
when Mrs. Coburn and her daughter came into the bedroom?
A. We just talked, Her daughter, Mrs. Coburn and all of
us talked together. We talked of different things, that is
all. Q. Did your father have any talk with them? A.
No, sir, in fact he could not talk to anyone. Q. Did you go
downstairs? A. I didn't go downstairs. My father waved
his hands, and Mrs. Coburn said, 'Come, he wants us to
leave the room.' Then I went downstairs, as she said. I
was down there about five minutes, when she said, 'Oh, Ellie,
come up here, I think Uncle Joe is dead.' Q. You were on
friendly terms with your father? A. I certainly was. I
never was parted from him. (The Court): You were on
friendly terms with Mrs. Coburn? A. Yes, sir. Q. You
were appointed administratrix of your father's estate in the
Orphans' Court? A. Yes, sir."

The letters of administration were offered in evidence. On cross-examination this witness said that she was not invited to stay at Mrs. Coburn's the night of September 25th, but Mrs. Coburn said, "You can come again in the morning." She further said he got out of bed while she was there but was very feeble; that she did not mean to say her father could not speak at all—his mind was clear and she could understand what he said; what he said was intelligent. Her husband treated her all right. He worked at the Sun Office and always provided her with a good home.

John Charles Shilling testified: that he was a mail clerk employed by the Manufacturers' Record, and had been connected with them for thirty-six years; that he was the husband of Mrs. Elenora J. Shilling; that they were married twenty-six years ago; that he was ejected several times by the old gentleman when he was courting his daughter; they lived with her father and mother after they were married because they did not want their daughter to leave them; that they were always friends; that they were never away from them very much until about seven years ago; the children were born in Mr. Dunn's house; he thought there was nothing like their children. After Mr. and Mrs. Shilling moved away and Mr. Dunn married again, she continued to visit her father; their relations were very affectionate up to the time of his death; when he came to his daughter's home to visit, he would kiss her at the door and wave good-bye; witness entered the deaths of Mr. Dunn and William T. Dunn in the family bible; Mr. Dunn lived with the Shillings one month or a little over after his second wife's death, and Mrs. Shilling continued to visit him after he left; on Tuesday, September 23rd, after finishing his day's work, witness went down to the market and not finding Mr. Dunn there went to his home and found that he was taking medicine; and asked him if he could do anything for him and he said there was nothing witness could do; he went home and told his wife he was very feeble and that she had better go see him, which

she did the next day. "I generally go to work in the afternoon; and, after leaving the Sun office about six o'clock, I went home. When I got home, my wife told me that someone had taken her father away from the Hanover Street house; that she did not see him, she said she was told that he was taken away in a taxicab, but they didn't know whether to the hospital or where. Then it came to my mind that his sister had taken him away, but I didn't know that she had taken him. With that my wife told me to telephone to Carrie (that is Mrs. Coburn), which I did that night about 10.15 from the Sun Office Building. I asked if her father was there, and Mrs. Coburn said, 'Yes, if Ellie wants to see her father, she can come up.' That is the remark I got over the telephone." "Q. Do you know whether he had any money on deposit in the Hopkins Place Savings Bank? A. I recalled that I remember his coming home just after his second wife died—about two weeks after her death—and handing my wife a bank book. He said to her, 'Ellie, take care of this until I call for it.' My wife gives it to me, and I put it amongst my private papers that I have at home locked in a tin box. I guess about two weeks after he left us to go back to his own home he called for that bank book, I don't know the exact date. Q. How long did you have that book? A. Well, I judge about six weeks."

Mrs. Eleanora Dennison testified that she is the aunt of Mrs. Shilling, her mother's sister; Mrs. Shilling's mother and Mr. Dunn were married in her house by Dr. Hyner of the German Reformed Church; they lived together until her death. Mrs. Shilling was the youngest child; there were two brothers, both of whom are dead; witness was present at the birth of Mrs. Shilling and her father said: "I want her named Eleanora Joetta Dunn"; she was named for her father; there never was any question about her legitimacy; the first Mrs. Dunn died about fifteen years ago: witness visited Mr. Dunn all her life; he acted very lovingly towards his daugh-

ter; Ellie was a good daughter to him, she offered him a home; witness got this from Mr. Dunn; he said he could go there and stay until he died; if he wanted to; he didn't go there to stay because he was independent and wanted to stay by himself; he was steadily employed all his life; he never asked a cent of anyone, and would feel highly insulted if you offered him any money. Witness kept house for him for about five months; witness never visited his second wife.

James T. Quinn testified that he lived in the house with the Dunns for about fifteen years; they were his tenants at No. 12 W. Camden Street; the relations between Mr. Dunn and his daughter were very pleasant and she was a very affectionate daughter; never heard anyone question the marriage of her father and mother.

William H. Bentz and Miss Amelia Kerner testified that they were cousins of Mrs. Shilling and had known her all her life; there never was any question about the marriage of her father and mother.

Mrs. Kate Schroeder testified to a conversation she had with Mrs. Coburn over the telephone. She talked for Mrs. Shilling, her sister-in-law, because she is nervous and cannot use the telephone. "I said, 'Ellie don't want this thing to go through court, there won't be anything left for anyone.' She said, 'It is not a fortune, Ellie ought to put it in a house. It won't be enough to buy a hat, if it goes through court. Another thing, Ellie is not the legitimate child of Mr. Dunn at all.' " Witness further testified that the relations between father and daughter were very affectionate; that on the day of the funeral of the stepmother, Mr. Dunn said to Ellie: "You and I are the only two left, we will have to live for one another," and she said, "Pop, come here and make your home with me." He said, "well, I will think over these things," and that is all he said that day; the old gentleman stayed with Mrs. Shilling after his second wife's death; witness visited her there. "I was there when he made biscuits. He was a great one to make biscuits and things like that."

Mrs. Mamie E. Spencer testified that she had known Mrs. Shilling for thirty years and knew her father well; had visited their house and stayed all night; was around there a great deal and father and daughter were very affectionate towards each other; he stayed with her a month after the death of his second wife.

The two most important witnesses for the appellee were officers of the bank, viz., Kirkland C. Frey, new account teller, and William F. Mahon, paying teller. Frey testified that he had been with the bank twenty years, he remembered the occasions of the visits of Mrs. Coburn to the bank about which she testified; she came to his window with a pass book in the name of Joseph Dunn, with a note signed by Mr. Dunn stating that he wanted her name placed on the book. "I asked the object of that—why he wanted her name placed on the book. She said that he was sick, and could not get down to the bank, and he wanted it placed there for convenience— so she could draw the money needed. I then asked her if Mr. Dunn wanted her to get the money in the event of her death. She said that he did not—that he wanted his daughter to have the money. She said: 'He will not put her name on it because he is afraid that her husband will get hold of it.' I told her the paper would not answer the purpose, and I gave her the proper blanks to have Mr. Dunn sign."

Witness explained that the bank preferred its own form and the one he gave Mrs. Coburn is the only form they have where another party has an interest in the account. "The next day she returned with the order properly signed, and then the account was transferred to a new book—Mrs. Coburn and Mr. Dunn as joint owners." The account was entered: "Joseph Dunn, in trust for himself and Carrie E. Coburn, joint owners, subject to the order of either, balance at the death of either to belong to the survivor." Witness' window is about five feet away from that of the paying teller. He does not know Mrs. Shilling. Did not have any talk with Mrs. Coburn after the death of Mr. Dunn.

W. F. Mahon testified that he had been employed at the bank twenty-one years; he is the paying teller. "On September 26th, the account was transferred from the name of Joseph Dunn to the names of Joseph Dunn and Mrs. Coburn. I heard the conversation between her and the new account clerk. She said that Mr. Dunn wanted the money in her name for his convenience—for her to draw the money while he was sick—and in case of his death his daughter was to receive it. Several days after the burial of Mr. Dunn, Mrs. Coburn wanted to draw out $1,650 to pay the doctor, the funeral bill and other things. As teller, knowing the circumstances, I refused the payment and let your Honor decide who is entitled to the money." Witness does not know Mrs. Shilling. Both the bank officers identified the signature of Mr. Dunn to the orders and card.

Mrs. Coburn in rebuttal testified that while the body of Mr. Dunn's second wife was in Mrs. Shilling's house, she said: "Pop wants to come here and board, but I couldn't have Pop around us. He is not clean for one thing, and another thing he worries me. I can't make over him, he don't make over me; and I can't make over him." "There was no affection or congeniality between them. Why, I have been in their presence dozens and dozens of times, and I have never once seen him caress her." She denied that she tried to draw $1,650 and said it was $1,500 and that she told Mr. Mahon what she wanted it for. "Q. What did he ask you? A. He said to me, 'That seems to be a large sum of money that you want to draw,' and I said to him, 'Well, I have Uncle Joe's funeral expenses, doctor's bill, house rent and market-master to pay, and I also want to pay for a tombstone for him.' "

Mrs. Coburn denied that Mr. Dunn stayed with his daughter a month after his wife's death, and said it was only ten days. "Q. Tell the court what reason she gave him? A. She would not receive him permanently. Q. Did he say why he wouldn't like to make his home there? A. One reason was because he would have to sleep with some one—he would not

have a room to himself; and another reason was that he didn't want to leave his apartment—he wanted to stay down there. Q. When she was up to see her father on the day before he died and she wanted to take him to her own home, why didn't you permit her to do that. Why did you say, 'I will ask Uncle Joe,' why didn't you let his own daughter ask him? A. She had a perfect right if she wanted to, but she said that she was afraid of him. She always wanted me to talk for anything she wanted, anything she wanted, she wanted me to ask him to give it to her. I asked him to give her ten dollars to buy a design for her stepmother. He gave it to me and I gave it to her. Q. Then you had more influence with him than his own daughter? A. Only in just this way. Q. You had more influence with him than his own daughter? A. I didn't feel that it was influence, I felt that he thought a great deal of me and had confidence in me; and that is the reason I transacted a great deal of his business.

No opinion of the learned judge below appears in the record, but the decree directs the clerk of the Circuit Court "to pay over to Elenora J. Shilling, administratrix of the estate of Joseph Dunn, deceased, the sum of seventeen hundred and eighty and 60/100 dollars, less the cost of these proceedings."

The testimony has been set out at unusual, and perhaps inordinate length, for two reasons: first, because the question involved is almost entirely one of fact; and secondly, because the attitude and animus of some of the important witnesses is revealed by their manner of testifying.

The legal questions involved are well settled and require but little discussion.

The case of *Milholland v. Whalen,* 89 Md. 212, is the leading case in Maryland establishing the validity of trusts of this character in relation to savings bank deposits. The late CHIEF JUDGE McSHERRY, who wrote the opinion in that case, said: "It is the donor's act which originates the trust and it is the intention with which he does the act that is material. The entry, unexplained, is a sufficient declaration of trust, because it indicates an intention to establish a trust; but this

may be rebutted." See also *Littig* v. *Mt. Calvary Church*, 101 Md. 494; *Mathias* v. *Fowler*, 124 Md. 665; *Farmer* v. *Farmer*, 137 Md. 69. Is the presumption in favor of the validity of the trust, in the case at bar, rebutted by the facts of the case?

Even as the facts appear to us from the record without having the benefit of the presence of the witnesses, we think the weight of the evidence strongly negatives the idea that Joseph Dunn intended to declare a trust in favor of appellant. We gather this from the original order to the bank which Mrs. Caldwell says he dictated; from Mrs. Coburn's own admission as to what she told the bank officers when this order was presented, and later when she tried to draw out the money after her Uncle's death; and from the clear and positive statements of these officials. Their testimony must have greater weight than that of Mrs. Coburn and her daughter, because they are absolutely disinterested witnesses and if they had any bias at all it would naturally have been in favor of appellant, who was with her mother a depositor at the bank. They both testified they did not know Mrs. Shilling, the appellee. But without reference to any conflict between the testimony of Mrs. Coburn and her daughter, and that of the bank officers, and relying upon the testimony of appellant and the members of her family, there is an absence of any satisfactory testimony to show that in the physical condition he was in at the time Mr. Dunn signed the blanks presented to him for his signature by Mrs. Coburn, he understood that the effect of them was in any respect different from what he had sought to accomplish by his original order, the purpose of which confessedly was to enable Mrs. Coburn to draw out money for the convenience of her uncle during his illness. The blanks were not read to him, and there is nothing to show they were explained to him, Mrs. Caldwell simply stating, when asked if they were read to him, "We didn't have to read them to him, he could read them himself"; and when the question was repeated she answered, "He read them himself." But the old man was angry because the bank re-

fused to accept the form of order he had sent them because
the bank preferred its own form, and when he had cooled off
and the blanks were handed him for his signature, all that
he did, apparently, was to sign them; and when he had done
that all that he said was "I hope that will be all right now."
Certainly there is nothing here to show that the sick old
man's intention had changed since he signed his own form
of order.

But if there could be any doubt about the correctness of
this conclusion, there is another ground on which the trial
judge could have decided in favor of the appellee. This is
clearly a case of confidential relations. We find an old man,
eighty-two years old, desperately ill, removed at his request
by his sister to the home of her daughter, a trained nurse,
and surrounded by the members of her family. It also ap-
pears from appellant's testimony that she had previously
transacted many of his business matters because of his con-
fidence in her. In such a case it is not necessary to prove
actual undue influence. The law presumes it, and casts the
burden upon the recipient of a gift under such conditions to
prove not only that it was the voluntary act of the donor un-
influenced by the donee, but also that he had the benefit of
competent advice and understood what he was doing. *High-
berger* v. *Stiffler,* 21 Md. 338; *Todd* v. *Grove,* 33 Md. 188;
*Whitridge* v. *Whitridge,* 76 Md. 54; *Zimmerman* v. *Bitner,*
79 Md. 115; *Horner* v. *Bell,* 102 Md. 435; *Hammersley* v.
*Bell,* 134 Md. 172. We think, weighing the testimony as it
appears in the record, appellant has failed to sustain this
burden.

And it must not be forgotten that the chancellor had the
benefit of the presence of the witnesses and was in a better
position to judge of the credibility of testimony.

If he believed the testimony given by and on behalf of
appellee, some, at least, of which appears to have been dis-
interested, he could hardly have avoided the conclusion that
much of the testimony of appellant was, to say the least, col-
ored by prejudice, and that the asperions made by her on the

legitimacy of appellee were without foundation. It was not, then, far to go to infer that this prejudice found its way from appellant to her uncle, in the absence of any fair explanation of his disinheriting a daughter between whom and himself affectionate relations had always existed, according to the testimony of all the witnesses except that of appellee and members of her immediate family.

But appellant contends that in any event it was reversible error to direct the payment to the administratrix of Joseph Dunn, because the administratrix as such was not a party to the proceeding. We do not find much force in this contention. The money had been paid into court by the savings bank, and the court was asked by the bill of interpleader to decide between appellant and appellee who were the only claimants. Both claimed under Joseph Dunn. The court decided that appellant had no claim to the money, and the appellee had only a beneficial interest in it and not the legal title, but that it belonged to the estate of Joseph Dunn. In such circumstances the only person entitled to receive the money was the administratrix who represented the estate.

*Decree affirmed, with costs to appellee.*