AGNES C. RAGAN *v.* JOHN C. KELLY ET AL.

[No. 3, January Term, 1942.]

*Decided February 4, 1942.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*Paul R. Hassencamp* for the appellant.

*Willis R. Jones* for the appellees.

FORSYTHE, J., delivered the opinion of the Court.

On September 14, 1937, Edward F. Kelly, late of Baltimore City, died at Bon Secours Hospital in Baltimore City. His only heirs and next of kin were a sister, Mary Ragan, her daughter, Agnes C. Ragan, and John C. Kelly, Edward F. Kelly, Ida Sjolander and Viola Smith, children of a deceased brother.

At the time of his death, Mr. Kelly was seventy-nine years old. Prior to his death he had on deposit at the Carrollton Bank of Baltimore, in his individual name, and subject to his individual order, the sum of $2,035.63. On August 9, 1937, Mr. Kelly signed an order authorizing the said bank to enter on his account the name of his niece, Agnes C. Ragan, so that the account then would stand as "Edward F. Kelly in trust, until withdrawal thereof, for self and Agnes C. Ragan, joint owners, subject to order of either, the balance at death of either to belong to survivor." On the same day the bank made the entry in accordance with the order.

Immediately, Agnes C. Ragan made a withdrawal of $500, and later $1,000, from the account, a part of which was expended by her while Mr. Kelly was in the hospital, for hospital bills and nursing, and a part was expended after his death for clothing, burial expenses and the doctor's bill.

On March 11, 1938, a bill of complaint was filed in Circuit Court No. 2 of Baltimore City by John C. Kelly, Edward F. Kelly, Ida Sjolander and Viola Smith against Agnes C. Ragan, Mary Ragan, John A. Brady, administrator of the estate of Edward F. Kelly, deceased, and the Carrollton Bank of Baltimore City.

The bill sought a decree, (1) that the paper-writing bearing the signature of Edward F. Kelly delivered to the Carrollton Bank on August 9, 1937, directing that his account be changed to read "Edward F. Kelly, in trust un-

til withdrawal thereof, for self and Agnes C. Ragan, joint owners, subject to withdrawal by either, the balance at death of either to belong to the survivor" be declared invalid, void and of no effect; (2) that the balance of $543.31 remaining on deposit in the Carrollton Bank be declared to belong to the estate of Edward F. Kelly, deceased; (3) that Agnes C. Ragan be required to account to the estate of Edward F. Kelly for all sums withdrawn from the aforesaid bank, except such sums as were used by her for the payment of the reasonable hospital and medical expenses of the said Edward F. Kelly during his lifetime; and (4) that the said admininstrator be required to administer the estate of Edward F. Kelly under the jurisdiction of Circuit Court No. 2 of Baltimore City.

After answers, testimony was heard and the court, on June 25, 1941, passed a decree directing Agnes C. Ragan "to account to John A. Brady, administrator of the estate of Edward F. Kelly, deceased, for the sum of $1,211.65 as representing the difference between the sum of $1,500 which she withdrew from a deposit in the Carrollton Bank of Baltimore, belonging to the said Edward K. Kelly and the sum of $288.35 which the said Agnes Ragan disbursed on the account of the said Edward F. Kelly prior to his death on September 14, 1937, to the end that the said sum of $1,211.65 may be administered in the Orphans' Court of Baltimore City in accordance with law." The decree also directed the Carrollton Bank to pay to the said administrator the sum of $576.56, representing the present balance on deposit in said bank, belonging to the estate of the said Edward F. Kelly, deceased. From that decree this appeal was entered.

The testimony contained in the record discloses that on August 1, 1937, Mr. Kelly became seriously ill and entered Bon Secours Hospital in Baltimore City. His condition necessitated a serious major operation, which was performed on August 7, 1937. Mr. Kelly died on September 14, 1937. On August 9, 1937, two days after the operation, and while Mr. Kelly was "a very sick man," his niece, Agnes C. Ragan, had him sign an order on

the Carrollton Bank, in which he had on deposit at that time $2,035.63, to change the entry on his account. On the same day, August 9, 1937, Agnes Ragan took the order to the bank, and the entry changed to its present form, as follows: "Edward F. Kelly in trust, until withdrawal thereof, for self and Agnes C. Ragan, joint owners, subject to order of either, the balance at death of either to belong to survivor."

The circumstances surrounding the actual signing of the order by Mr. Kelly were told by the witness Danko, who occupied the room with Mr. Kelly on the day the order was signed. Danko testified Agnes Ragan came into the room about 10 o'clock in the morning, and Mr. Kelly "asked her if she had brought the papers"; she produced the papers and Mr. Kelly "asked for his glasses and took the paper and read it over and asked where he should sign." The witness described the paper as being of "legal size" and was emphatic in stating that it was not the cards shown him at the trial. Also, he said he saw no other papers signed. This witness heard no discussion about the papers, either before or at the time they were signed, and did not know the nature of the transaction. On that day, Danko said Mr. Kelly told him he was "in great pain," but it was the witness' opinion that Mr. Kelly knew what he was doing.

A nurse, Miss Gonley, was called in to witness Mr. Kelly's signature. The card was signed in her presence. She said, "when he signed the card he seemed to know what he was doing." The witness heard no discussion about the card, but knew that Mr. Kelly "suffered a good deal." Like Danko, Miss Gonley did not know the nature of the transaction. There was no other testimony concerning the actual signing of the card, or that would throw any light on anything that had transpired between Mr. Kelly and Agnes Ragan prior to the signing of the card.

The bank teller, Stiemly, testified Agnes Ragan came to the bank on the morning of August 9, and presented Mr. Kelly's bank book and told him her uncle "was quite

seriously ill in the hospital and she needed money to pay his hospital bills and doctor bills and wanted to know just how it could be arranged that she could make the withdrawals." He explained to Miss Ragan the procedure required by the bank, and gave her the card to be signed by Mr. Kelly. Miss Ragan took the card and later returned with Mr. Kelly's signature on it. The account was then entered in accordance with the card.

Mrs. Ida M. Sjolander, a niece of Mr. Kelly, and one of the plaintiffs in the bill, testified she had a conversation with Agnes Ragan on the night of August 8 (the night before the card was signed), as follows: "I asked Agnes if she had taken care of Uncle Eddie's affairs and she said, 'Why?' I said, 'Have you his bank book?' and she said, 'Yes.' and she said, 'How did you know he had any money?' And I said, 'Well, I have known it for some time.' And I said, 'Whose name is the bank book in?' And she said, 'It is in Uncle Eddie's name.' She said, 'How could I get my name on it?' And I said, 'Owing to his condition tonight, it is impossible for you to do that,' and the matter was dropped and that was all that was said." The witness also said later: "I asked what bank it was on and she refused to tell me and I asked how much was on deposit and she refused to tell me."

In reference to the transaction with the bank, Agnes C. Ragan testified: "I went to the bank and told them this was my Uncle's book and he wanted my name put on the book just the same as the book I carried, which was from the Metropolitan Bank." It was stipulated that the book she carried was in the name of the witness and her mother, with the same provision for survivorship as now appears on Mr. Kelly's book. Agnes Ragan further testified Mr. Kelly's bank book was given to her by one of the sisters of the hospital, together with keys and cash money. On cross-examination, Miss Ragan was asked: "You didn't question that it was Mr. Kelly's money and you intended to spend it for him to the extent necessary, is that right?" A. "Yes."

On the 9th of August, after the transaction of changing the entry on the bank book was completed, Miss Ragan drew out $500, and on August 24, $1,000. Both amounts were deposited in her account in the Metropolitan Bank. She explained that was done for her convenience, as the Carrollton Bank was a greater distance from her place of employment.

From the time Miss Ragan drew the money until after Mr. Kelly's death, she paid all hospital bills, including nurses. Also, she paid the burial expenses and the doctor's bill—in all, something over $1,200.

The appellees contend that the placing of the name of Agnes C. Ragan on Mr. Kelly's bank book was for the specific purpose of enabling her to draw from the account money to pay the hospital and nurses and any other bills that might be necessary during Mr. Kelly's illness, and that the balance of what was left after paying all bills incurred before Mr. Kelly's death now belongs to the estate of Mr. Kelly and must be paid to the administrator. The appellant, Agnes C. Ragan, insists that, under the terms of the entry in the bank book, all of the balance now remaining in the bank, and all of the balance of the $1,500 she withdrew, now belongs to her.

Numerous cases have been before this court involving bank deposits, some of them somewhat similar to this case. The circumstances under which deposits were made vary in many instances, but certainly since the decisions of this court in the *Millholland-Whalen Cases*, reported in 89 Md. 199, 43 A. 45, 44 *L. R. A.* 208, and 89 Md. 212, 43 A. 43, 44 *L. R. A.* 205, the legal effect of an entry in a bank book similar to the entry in this case has definitely been settled. The general rule there adopted, and since followed, is that the entry, as it stands, is a sufficient declaration of a trust as it, unexplained, indicates an intention to create a trust. But the entry may be explained and the intention it indicates may be rebutted.

In any particular case, the question whether a trust in law has been created effectually to vest the fund in

the survivor depends entirely upon the actual intention of the original owner of the fund at the time he had the entry in the bank book made. *Millholland-Whalen, supra.* In this case there now can be no question that the entry in Mr. Kelly's bank book is sufficient, as it stands without explanation, to vest the entire ownership of the balance of the fund remaining after Mr. Kelly's death in the appellant Agnes C. Ragan, provided it be found from all the facts and circumstances, under which the entry was made, that such was Mr. Kelly's definite intention.

The facts, as disclosed by the evidence in this case, from which an intention to establish a trust, vesting full ownership in the survivor, must be ascertained are few and simple, and the evidence comes, principally, from two witnesses, Miss Agnes Ragan and Mr. Stiemly, the bank teller.

The situation as here presented is that of an unmarried man, seventy-nine years of age, who had been living in a boarding house, became seriously ill and was compelled to go to a hospital for a serious major operation. His only living relatives are a sister, and nephews and nieces. One of his nieces, who, apparently, had taken more interest in him and his affairs than any of the others, immediately went to him. She at once realized that the expenses of her uncle's illness would have to be paid, and, knowing he had money in the Carrollton Bank, went to the bank and inquired of the bank official how it could be arranged so that she could draw on her uncle's account for necessary money to pay the hospital and nurses. When informed by the teller of the bank that Mr. Kelly would be required to change the entry on the bank book, the niece secured a card to be signed by Mr. Kelly for that purpose. The card was given to her, and it was a printed form of the entry required by the bank. It required only the signature of the depositor in a space left blank above the printed terms of the contemplated entry. Miss Ragan took the card to the hospital and had Mr. Kelly sign it, as above detailed. She then returned the signed card to the bank, and the entry accord-

332

ingly was made thereby enabling Miss Ragan to carry out her expressed purpose of paying her uncle's hospital expenses.

It is conceded that the money in the account belonged to Mr. Kelly, and the statement of the bank teller in reference to Miss Ragan's statement to him of the reason for changing the entry is not contradicted. It is denied in Miss Ragan's answer, but not contradicted by Miss Ragan when she testified. In her testimony on cross-examination, Miss Ragan distinctly said she knew the money belonged to Mr. Kelly, and she intended to pay his expenses out of it. There were no other witnesses who knew what transpired between Mr. Kelly and Miss Ragan before or at the time the order was signed.

According to the hospital record, which included the bedside notes, Mr. Kelly was on the operating table four hours on August 7, and on August 9, the day the card was signed about 10 A. M. by Mr. Kelly, he was, between the hours of 6 A. M. and noon, in great distress, and required considerable attention. It was while in that condition Mr. Kelly signed the card, and without any evidence other than that of his fellow patient, and nurse, that "he seemed to know what he was doing," a grave doubt exists whether Mr. Kelly, in his extremely ill condition, fully understood the full effect of what he was attempting to do, and understood that he was relinquishing control over his money, and that such was his actual intention, rather than merely making it possible for his niece to obtain sufficient money only for his needs in his then emergency.

The appellant contends that the possession of the bank book by Miss Ragan signifies that it was the intention of Mr. Kelly to relinquish control over the fund.

The possession of the bank book is not, of itself, sufficient to establish intention. A great deal may depend upon how the possession of the book was obtained. In this case it is conceded that Miss Ragan secured the book from one of the sisters of the hospital. The sister had taken it, together with keys and some cash money,

and placed it in an envelope for safe keeping, and delivered it to Miss Ragan. There is no evidence that Mr. Kelly knew the sister had given it to Miss Ragan, he did not instruct her to do so, and at the time he signed the card he said nothing about it. It is entirely reasonable to believe Miss Ragan secured the book from the sister by giving the same reason she gave the bank teller. We do not, however, mean to infer that Miss Ragan, in any way, intended to deceive the sister in order to secure possession of the bank book.

The mere possession of the bank book by Miss Ragan does not alone conclude the question of an intention on the part of Mr. Kelly to constitute her the owner of the fund. Possession necessary to do that must be with the full knowledge of the owner of the fund. In *Millholland v. Whalen, supra* (89 Md. 199, 43 A. 49, 44 *L. R. A.* 208), in speaking of a deposit similar in terms to that in this case, it is said: "If thereafter she had deliberately given the book to her sister, with the intention of donating the fund to her, and had reserved no control over it herself * * * there would have been a perfected gift of the money, vesting the ownership thereof in Mrs. Whalen * * *. Though the delivery of the pass book would have been a delivery of the fund, the circumstances developed in the testimony fail to show a delivery of the book by Miss O'Neill to Mrs. Whalen."

In *Coburn v. Shilling*, 138 Md. 177, 113 A. 761, a case very similar, in some of its aspects, to the present case, it was held that where an aged and ill man requested the bank to change the entry in his account so that his niece might draw on it, and the bank changed the entry in conformity to an accepted form adopted by the bank, which was the same as was used in this case, a trust was not created in favor of the niece, but it was only to enable her to draw out money for the convenience of the uncle. In that case the bank refused to make the change of entry as requested by the owner of the fund, but insisted that its special form be used. Exactly as in this case, the bank declined to make any change ex-

cept it be done in accordance with the special form used by the bank. As a result of the bank preferring to use its own form of entry, an intention was attributed to Mr. Kelly entirely different from his apparent intention as expressed by Miss Ragan to the teller of the bank. *Murray v. Cannon*, 41 Md. 466; *Shaefer v. Spear*, 148 Md. 620, 129 A. 898.

The evidence in this case fails to establish a clear and definite intention on the part of Mr. Kelly to relinquish absolute control over his money, or that it was his desire that Miss Agnes Ragan become the owner of it at his death; nor does the possession of the bank book, under the circumstances under which it was obtained, constitute an irrevocable trust in favor of Miss Agnes Ragan. On the contrary, the evidence of Miss Ragan, and that of the bank teller, show conclusively that such was not Mr. Kelly's intention.

There is another fact in the case which lends very strong support to that conclusion. Mr. Kelly had another account with a building association, amounting to $9,000, and some years ago he had the entry on that account made in his own name and the name of his sister, Mary Ragan, the mother of Agnes Ragan. It is entirely reasonable to believe that had Mr. Kelly intended Agnes Ragan to have, after his death, the fund in the Carrollton Bank, he would have had the entry made before he entered the hospital.

From all the facts and circumstances, as they appear from the evidence in this case, the conclusion is unescapable that the legal effect of the entry on the bank book in this case was intended to, and did, create a special trust for a definite and specific purpose, and the trust came to an end upon the dealth of Mr. Kelly. 65 *C. J.*, Sec. (16) H, p. 227, and note 11 (c) on p. 228; 26 *R. C. L.*, Sec. 39, p. 1201; 3 *R. C. L.*, sec. 347, p. 715, Sec. 349, p. 718.

With the money withdrawn from the Carrollton Bank, Miss Ragan expended something over $1,200 on account of Mr. Kelly's illness and funeral expenses. The exact

amount is not clear. At the trial, counsel spoke of an account which evidently they had before them, but it is not in the record, and the testimony of the amount expended does not correspond to the amounts mentioned in the decree. It is true Miss Ragan paid out some of the money after Mr. Kelly's death, for the funeral expenses and the doctor. Those were debts against the estate, and properly payable by the administrator. But when she paid them, Miss Ragan was acting in perfect good faith, and we have not the slightest doubt but that she conscientiously believed it was her duty, in accordance with the duty imposed upon her when the arrangement with the bank was made for her to draw on Mr. Kelly's account. While technically she should account to the administrator for money spent after Mr. Kelly's death, under all the circumstances it would be a great injustice to require her to do so. Since she paid only just and reasonable bills, which the administrator would have been compelled to pay, and out of the very same fund, she should be subrogated to the rights of the undertaker and the doctor in the settlement of the estate, and, in her accounting to the administrator, a credit should be allowed her equal to the full amount of money so expended from the $1,500 withdrawn.

Subrogation always will be granted when an equitable result will be obtained. 60 *C. J.*, Sec. 22, p. 709. Payments made in ignorance of real facts cannot be said to be voluntary. A person who has paid a debt under the colorable obligation to do so, or under an honest belief that he is bound, or who mistakenly but in good faith believes he is liable, will be subrogated. 60 *C. J.*, Sec. 27, on page 719, also Sec. 36, on page 725.

This is not a case of a mere volunteer, who, without any duty, moral or otherwise, pays the debt of another, but it is a case of a person intrusted with a special duty, who, in the discharge of that duty, pays debts she honestly thought she should pay. In a case like this she is entitled to be subrogated to the rights of those whose claims have been paid. 25 *R. C. L.*, Sec. 53, p. 1370. There is

no question here that the administrator could have been compelled to pay the debts, or that it is his duty to reimburse another who, under such circumstances, has paid them. 60 *C. J.*, Sec. 26, p. 712. In *Pease v. Christman,* 158 Ind. 642, 64 N. E. 90, it was held that money spent by a widow, before the appointment of an administrator, for the expenses of a monument to the grave of her deceased husband, should be classed as funeral expenses, and she should be subrogated to the rights of the debtor, and could recover against the administrator.

The decree in this case required Agnes C. Ragan to account to the administrator for all of the balance of the $1,500 she withdrew, remaining after the payment of hospital and nursing expenses prior to Mr. Kelly's death. A decree must be passed, (1) requiring Agnes C. Ragan to account for, and pay over to the administrator, the unexpended balance of $1,500 withdrawn by her from that account, after allowing her credit for all money expended on Mr. Kelly's behalf, either before or after his death; (2) requiring the Carrollton Bank to pay to the administrator the balance remaining in the account of Edward F. Kelly.

> *Decree affirmed in part and reversed in part. Remanded for a decree in accordance with this opinion. Costs to be paid out of the estate.*