FILLMORE COOK, Executor *v.* AUDREY LOUISE HOLLYDAY

[No. 66, October Term, 1945.]

*Decided February 7, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, and MARKELL, JJ.

*Joseph Townsend England* for the appellant.

*Edward L. Ward,* with whom was *John R. Norris,* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Fillmore Cook, executor of the estate of Florence Evelyn Cook, deceased, from the verdict of the jury and the decision and determination on the issues submitted, and from the overruling and refusal of a motion for judgment *n.o.v.* (notwithstanding the verdict), in a case of caveat filed to the will of Florence Evelyn Cook by her daughter, Audrey Louise Hollyday.

The testatrix in the will in question devised all her property to her daughter, Audrey Louise Hollyday, subject to Items II and III of the will. She named her brother-in-law, Fillmore Cook, as executor without bond.

For a proper consideration of the case it is necessary to quote Items II and III, which follow:

"Item II. Whereas, upon good and valuable considerations, I have heretofore entered into an agreement with my brother-in-law, Fillmore Cook, on behalf of himself, his wife, Catherine E. Cook, and his daughter, Vivian Dorothy Cook, their heirs, personal representatives and assigns, whereby I have agreed that before my undivided one-half right, title, interest and estate in the fee simple property, known as the Aurora Theatre lot and improvements, Nos. 7 and 9 East North Avenue, Baltimore, Maryland, and also my forty-nine shares of the Capital Stock of the Paradise Amusement Company, a body corporate of the State of Maryland, or any part, right, title, interest, estate or share thereof, shall be sold, mortgaged, otherwise disposed of, or enure to others thereto or therein, or be offered for sale, mortgage, other disposition thereof or any enurement to others thereto or therein occur in any manner whatsoever, except as to the devise

and bequest thereof to my daughter, Audrey Louise Holly-day, made in this, my Last Will and Testament, the same shall *first be offered for sale to the said Fillmore Cook, or case of his death, to his widow, Catherine E. Cook, or in case of the death of both the said Fillmore Cook and Catherine E. Cook, to their daughter, Vivian Dorothy Cook, their heirs, personal representatives or assigns,* at and for the price of twenty-thousand ($20,000.00) Dollars, less one-half of the balance of any mortgage indebtedness and accrued interest remaining unpaid and accruing under any mortgage existing upon the entire fee simple estate in said property Nos. 7 and 9 East North Avenue, and that no sale, mortgage, other disposition or enurement to another or others thereof, shall be offered, negotiated, made, consummated or enurement be effective until the said Fillmore Cook, Catherine E. Cook, or Vivian Dorothy Cook, as the case or lives may be as aforesaid, shall have refused to purchase as aforesaid or shall have renounced his or her rights under said agreement by a writing under his or her hand and seal, duly witnessed and acknowledged according to the law governing the execution of Deeds, and I now charge my undivided right, title, interest and estate in said fee simple property and my said forty-nine shares of the Capital Stock of The Paradise Amusement Company in the devises and bequests hereinafter set forth with the aforementioned terms, provisions, and stipulations of said Agreement." (Italics supplied here.)

"Item III. After the payments enumerated in Item I hereof, and subject to the terms, provisions and stipulations of the agreement set forth in Item II hereof, I give, devise and bequeath all my estate, property and effects, real, personal and mixed, in possession, reversion, remainder and expectancy, and wheresoever situated unto my daughter, Audrey Louise Hollyday."

The issues submitted to the jury and the answers of the jury to those issues follow:

"1- Were the contents of said paper-writing, dated the 18th of January, 1943, purporting to be the Last Will

and Testament of Florence Evelyn Cook, read to or by the Testator, or known to her at or before the time of the alleged execution thereof?"

A. Under the instruction of the Court, "Yes."

"2- Was the execution of said paper-writing, dated the 18th day of January, 1943, purporting to be the Last Will and Testament of Florence Evelyn Cook, procured by undue influence exercised and practiced upon her?" A. "Yes."

"3- Was the said paper-writing, dated the 18th day of January, 1943, purporting to be the Last Will and Testament of the said Florence Evelyn Cook, executed by her when she was of sound and disposing mind and capable of executing a valid deed or contract?" A. "No."

"4- Was the said paper-writing, dated January 18th, 1943, and purporting to be the Last Will and Testament of Florence Evelyn Cook, deceased, procured by fraud and misrepresentation exercised and practiced upon her at the time of the execution of said paper-writing?" A. "Yes."

The appellant testified that previous to February 24, 1933, Mrs. Lula H. Cook owned a one-third interest in the properties, Nos. 7 and 9 East North Avenue, the real estate, the bowling alleys, and thirty-three and one-third shares, a one-third interest, in the Paradise Amusement Company. He owned a one-third interest in the same properties and stock and the remaining one-third interest was owned by the testatrix, who inherited it from her husband, the brother of the appellant. This one-third interest of Lula H. Cook was offered to him for the price of $5,333.33 (one-third of $40,000, less one-third of the then balance on the mortgage and the thirty-three and one-third shares of stock at $10 per share) and not to the testatrix. If he had acquired it in his own right, the testatrix would have then owned a one-third interest in the properties and stock and he would have owned a two-thirds interest. He testified that he and the testatrix then made a verbal agreement. He said, "The agreement was that Mrs. Florence Evelyn Cook and myself would

take over the interest of Mrs. Lula H. Cook in the property numbers 7 and 9 East North Avenue, the real estate, the bowling alleys, and the thirty-three and one-third shares of the Paradise Amusement Company in our joint names and would then, each of us, transfer to my wife one of our shares of stock in the Paradise Amusement Company, which would leave forty-nine shares in my name and forty-nine shares in the name of Mrs. Florence Evelyn Cook, and two shares in the name of Catherine E. Cook, my wife, and that was made for the purpose of giving my wife and myself the controlling interest in the corporation, the Paradise Amusement Company.

"Q. Now, was that the whole agreement? A. No, sir.

"Q. What else? A. That is part of it.

"Q. Go ahead? A. That Mrs. Florence Evelyn Cook would not transfer this property—her interest in the real estate, in the bowling alleys, and her forty-nine shares of stock to anyone except myself, my wife, or my daughter, at the same price at which it had been sold by the rest of the family to Mrs. Lula H. Cook, to my brother, Mr. John B. Cook, and myself, which was at the rate of forty-thousand dollars, and that upon the death of her daughter the property would be transferred to either of us, myself, my wife, or my daughter, at the same figure, forty thousand dollars, and that no sale or offer of sale should be made to anyone except myself, if living, or my wife or daughter if I had been deceased."

He further testified that at the time this verbal agreement was made he had been a practicing attorney for thirty-one years, was attorney for Florence Evelyn Cook and had been attorney for her prior to that time and since, and had prepared the will in question. He further stated that after the agreement was made Mrs. Lula H. Cook's interest was conveyed on February 24, 1933, in a deed drawn by him. The testatrix and he then each sold one share of stock to his wife, Catherine E. Cook, for $10 a share thereby giving Fillmore Cook and his wife a fifty-one percent interest in the corporation and leaving the testatrix with a forty-nine percent interest.

that he ought to see her and as a result of that message he went to her home to see how she felt, talk to her, and see whether he could be of any assistance or service to her as they had always been very friendly, as friendly as two people could be. When he arrived she was suffering some pain and he knew that she was ill.

On the following day, Sunday, January 17, 1943, he again went to the testatrix's home, proceeded to her bedroom on the second floor, and sat on the side of testatrix's bed. At that time he said she was a very sick woman. The caveatrix and daughter of the testatrix, Audrey Louise Hollyday, sat in a chair at the foot of the bed. The testatrix then said to him, "I want to make by Last Will and Testament." He then asked her what provisions she desired to make. She stated that she wanted to leave her entire estate to her daughter. He said to her, "That would include the Aurora Theatre property, as well as the Highlandtown Post Office property and your personal and real estate, including this home." The testatrix said, "Yes." He said to her, "Is Audrey familiar with the terms of the contract that exists between you and I concerning the Aurora Theatre property and stock." She said, "I don't know whether she is thoroughly familiar." He said, "Well, then, to make her thoroughly familiar would you mind telling her now in detail just what are the terms of our contract." She said, "Yes, indeed," and he said that "she proceeded to tell in her own words the terms of the contract which are as stated in the will." When asked what the testatrix told her daughter, he said, "Perhaps I can remember the exact—I cannot perhaps remember the exact words she used but she told her that when the one-third interest which had been owned by Mrs. Lula H. Cook in the Aurora Theatre, and Stock of the Paradise Amusement Company, was transferred to she and I, it had first been offered to me, and that in the kindness of my heart I invited her to come along with me in the ownership of that one-third interest, that two shares of stock were to be held by my wife, and she had

He further stated that on Saturday, January 16, 1943, his wife called him on the phone from testatrix's home telling him that testatrix was seriously ill and she thought sold one share of stock to my wife and I sold one share of stock to my wife, so that I would have, with my wife, fifty-one shares, and the controlling interest, and that it had been agreed because of that *she would not sell to anyone else except me, or my wife, or my daughter at any time, and when the sale would be made it would be at the same rate at which the property had been sold to us,* (italics here), and at the same rate at which the property had been sold to the three of us prior thereto by the rest of the family, and that *at the expiration of her death, of her daughter's death, or the survivor, that that interest was then to be sold to me at that rate.* (Italics here.)

"Q. Did she say anything about a contract or agreement from you to her? A. No, sir, there was no contrary agreement. That was the consideration for the agreement that she made with me, was the fact that I permitted her to come in, otherwise I would have had an entire two-thirds interest in the Aurora Theatre and sixty-six and two-thirds of the one hundred shares of outstanding stock and she would have had one-third only."

When later asked on cross-examination whether she said personal representatives, heirs and assigns, his answer was, "No, sir, she didn't use those words." He further said on cross-examination that upon the death of the testatrix's daughter, Mrs. Hollyday, it would go to his heirs and personal representatives by purchase. When asked on cross-examination, "Suppose you, and your wife, and your daughter dies, what would become of Mrs. Florence Evelyn Cook's share?" The appellant objected to this question. It was overruled and an exception noted. As this was apparently a question as to appellant's interpretation of the clause in the will, which he drew, we see no objection to its admission. He answered that it would have gone to the heirs of the last survivor, his daughter or heirs or personal representatives; personal represen-

tatives in the case of stock and heirs in the case of real estate and that he did not give the same privilege of purchase which he had.

The appellant further testified that, after the testatrix had explained to her daughter the terms of the contract, he asked her whether she thought it was proper for that to be embodied in the will, and she said, "Absolutely so." He further stated that he prepared the will at his home that night and on Monday, January 18, 1943, the date the will was executed, he and his wife went to the testatrix's home between 12:00 noon and 12:30 o'clock. A Dr. Shamer was upstairs with the patient. He told Dr. Shamer, when he came down, that he had the will of Mrs. Cook, which she asked him to prepare, and he requested the doctor to be one of the witnesses. The doctor said that he did not have time to wait and, in answering a question from the appellant, stated that the testatrix was of sound and disposing mind and capable of executing a valid deed or contract and that her mind was absolutely clear.

The appellant then went upstairs and told Mrs. Cook he had the will and would like her to read it all the way through. He had drawn it in triplicate, two original copies and one office copy. After she had read the will entirely, with one copy in his hand, one in Audrey Holly-day's hand, and one in the testatrix's hand, he read the entire will to her from beginning to end and asked her if she completely understood it. She replied that every-thing was satisfactory to her. She was in bed at the time resting on her left side. He then called Dr. Wal-lenta, a minister, and Mrs. Key, a nurse, from the living room opposite the bedroom and they came in the bed-room, and the testatrix signed the will in their presence and the presence of the caveatrix, Audrey Louise Holly-day, who made no protest. Dr. Walenta and Mrs. Key signed as witnesses, at the request of the testatrix. The appellant left a copy of the will with the testatrix and took one original copy and the office copy with him. Florence Evelyn Cook died on January 31, 1943.

At the time of her death the testatrix was vice-president of the Paradise Amusement Company and had held that position since 1933. The appellant had been president of the corporation since that time. The theatre, which occupied part of the property, had a seating capacity of about four hundred. The testatrix received a weekly salary of $40. At the time Mrs. Lula H. Cook's interest was bought there was a $25,000 mortgage on the property, which, at the time of testatrix's death, had been reduced to $18,500.

Before testatrix's death, Mrs. Catherine E. Cook, the wife of the appellant, received a salary of $5 per week as secretary. After testatrix's death the wife of the appellant took her place and received the same pay as Mrs. Florence Cook, $40 a week. The salary of the appellant was $100 a week. The rent from the property in dispute was $4,800 per year, of which amount $3,900 was paid by the Paradise Amusement Company. As shown by the statement filed in the case, before the payment of salaries of officers of $7,540 and the rent of $3,900, the net profits of the Paradise Amusement Company for the year 1942 was $22,592.77. Therefore, at the time the testatrix executed the will in question the appellant was receiving in salary $100 per week, $5,200 a year, rent in the amount of $1,950, and his share of the net profit for the preceding year was $5,464.85, making total receipts to him for the preceding year of $12,614.85. His wife, Catherine E. Cook, received a salary of $260 a year as secretary and her share of the profits from the Paradise Amusement Company $223.06, making total receipts to appellant and his wife for the preceding year of $13,097.91. The testatrix received during that year salary of $2,080, rent of $1,950, and her share of the profits of the corporation were $5,464.86, making total receipts to her of $9,494.86. These calculations are made here and are as accurate as possible from the testimony submitted.

The net profits of the corporation according to the exhibit for the year 1943 before the payment of rent

and salaries of officers was $22,486.73. It therefore appears that under this item in the will drawn by the appellant himself, and when he was attorney for the testatrix, that before the interest of the testatrix could be sold or otherwise disposed of, that the appellant, his wife, daughter and heirs were given the option to purchase for $20,000 the interest of the testatrix from which she received, during the last year of her life, $9,494.86. As hereinbefore pointed out, the wife of the appellant succeeded to the salary of the testatrix. All the testimony herein recited was given by the appellant himself and comes from no other witness. Although there is no testimony from the appellant to that effect, the daughter, Audrey Louise Hollyday, admitted that on Sunday, January 17, 1943, when the terms of the will were discussed, the appellant asked the testatrix whether she desired him to serve as executor without bond, to which question the testatrix answered, "Yes." This is not denied by the appellant.

The appellant further testified that Mrs. Hollyday, after her mother's death, came to see him and told him that she did not understand the terms and provisions of the will. She later asked about the contract and if it did not work both ways. He told her that it was never intended to work both ways and the agreement was not to that effect. Mrs. Hollyday then said to him that she did not think that it was fair. He told her that it was fair. She then asked if he would not enter into an agreement with her so that she would have the same rights that he had. He said he refused to do this as it would entirely negative the agreement he had made with her mother as explained in the will.

We will first discuss the second issue, whether undue influence was exercised upon the testatrix. Our ruling on that issue will not necessitate consideration of the other issues in the case.

The appellant particularly excepts to that part of the instruction of the Court in which the jury was instructed, "* * * then if you find that there was a confidential

relationship, the fact that there was a confidential relationship imposes the burden upon Mr. Cook to prove by a fair preponderance of the evidence that their dealing was in the most perfect good faith on his part and was equitable and just between himself and Mrs. Cook, and if you find that it was not in perfect good faith and equitable and just, your verdict on this issue and your answer thereto will be 'yes'."

In the case of *Griffith v. Diffenderffer*, 50 Md. 466, Romulus Griffith was the son-in-law, agent, and attorney-in-fact of the testatrix and entrusted with the management of her affairs. He employed his own counsel to draw the will, was consulted by the testatrix as to the making of that instrument, and otherwise took an active part in the preparation and execution of the same by which he was largely benefited. The Court in that case pointed out that in gifts *inter vivos* between such persons it is incumbent on the donee to show that it was the free and voluntary act of the donor. However, there is an obvious difference between a gift whereby the donor strips himself of the enjoyment of his property while living and a gift by will, which takes effect only from the death of the testator. In cases of gifts by will the fact that a party is largely benefited by a will prepared by himself is nothing more than a suspicious circumstance of more or less weight according to the facts of the case. See notes and comments *Cornell Law Quarterly*, Volume XXXI, No. 1, September 1945, page 80.

In the case at bar, however, Item II of the will is not a gift under a will, but as contended by appellant is the confirmation of an oral agreement, between the appellant and the testatrix and a contract which attempts to confer a one-sided option on all persons affected. The item itself recites that it is the confirmation of an agreement. We must therefore look upon this item in the light of what it is admitted to be, the written expression of an alleged oral contract previously made between the appellant, an attorney, and the testatrix, his client, and not a gift by will.

Judge Delaplaine very recently pointed out in the case of *Baker v. Otto,* 180 Md. 53, 55, 56, 22 A. 2d 924, 925, "The general rule is firmly established both at common law and in equity that any disputed transaction between attorney and client is *prima facie* fraudulent and invalid, and the burden is upon the attorney to show that he used no undue influence or deception but that the transaction was fully understood and fair in all respects. * * * The rule is founded on public policy because the confidential and fiduciary relationship enables an attorney to exercise a very strong influence over his client and often affords him opportunities to obtain undue advantages by availing himself of the client's necessities, credulity and liberality. Courts of equity consequently watch over such transactions with great solicitude and exercise the most exact scrutiny to be certain that the attorney has taken no unfair advantage of his client. *Merryman v. Euler,* 59 Md. 588, 43 Am. Rep. 564; *Etzel v. Duncan,* 112 Md. 346, 76 A. 493; *McLean v. Maloy,* 136 Md. 467, 513, 111 A. 91, 107; *Rhodes v. Ries,* 99 N. J. Eq. 638, 133 A. 712; 23 *Am. Jur., Fraud and Deceit,* Sec. 14. * * * The extreme degree of care required for the correction of abuses of confidence was recognized by Chief Judge Robinson in the following words: 'No part of the jurisdiction of the Court is more useful, it has been said, than that which it exercises in watching and controlling transactions between parties standing in a relation of confidence to each other. * * * The broad principle * * * is that wherever there exists such a confidence * * * the Court will not allow any transaction between the parties to stand, unless there has been the fullest and fairest explanation and communication of every particular resting in the breast of the one who seeks to establish a contract with the person so trusting him.' *Zimmerman v. Bitner,* 79 Md. 115, 126, 28 A. 820, 821, 822. In determining whether an attorney or any other beneficiary in a confidential relationship has met the burden of proof which the law casts upon him, the Court must consider all the facts and circumstances in each particular case.

*Mead v. Gilbert,* 170 Md. 592, 606, 185 A. 668. * * *
Where a client is aged, or where the attorney has an
aggressive or dominating personality while his client is
easily influenced, the burden imposed upon the attorney
to sustain any dealings with his client is extremely strin-
gent. *McKnight v. Gizze,* 107 Conn. 229, 140 A. 116;
*Armstrong v. Morrow,* 166 Wis. 1, 163 N. W. 179, Ann.
Cas. 1918 E., 1156; 5 *Am. Jur., Attorneys at Law,* Sec.
48; 7 *C. J. S., Attorney and Client,* Sec. 127." See, also,
*Gerson v. Gerson,* 179 Md. 171, 20 A. 2d 567; *Chase v.
Grey,* 134 Md. 619, 623, 107 A. 537.

Where it is found that a person was so weak in body
that she was a mere passive instrument in the hands of
others, and the Court can presume that the person
through whose influence the transaction was made for
his own benefit was conscious that he was obtaining an
unjust disposition, it is obvious that the transaction
should not be permitted to stand. Applying the facts
of this case, based on the testimony of the appellant
alone, to the law so often expressed by this Court, we
find that at the time this alleged oral agreement was
entered into that the appellant had been practicing law
for a period of approximately thirty-one years. That
the testatrix was his client and sister-in-law before the
alleged transaction, during the transaction and ever since
until the time of her death. Further that each owned a
one-third interest in the properties and stock in ques-
tion. That he was offered the remaining one-third. That
at his suggestion he and the testatrix each bought the
remaining one-third interest, paying equally for it. That
further, at his suggestion, she conveyed one share of
stock to appellant's wife, giving appellant and his wife
control over the corporation.

The settlement with Mrs. Cook was made on the basis
of $40,000.00 for the total realty and $1,000.00 for the
total stock, or a total of $41,000.00. From that amount
was deducted the mortgage of $25,000.00 making the
equity $16,000.00 and making the purchase price of Lula

Cook's one-third interest in the real estate and stock $5,333.33. Notes in the amount of $5,000.00 were given by Fillmore Cook and Florence Evelyn Cook and later paid from the receipts from the property purchased. The balance of cash then due Lula Cook was $333.00 and, with adjustments, actual cash of $238.52 was paid, of which amount Florence Evelyn Cook paid $119.26 and Fillmore Cook paid $119.26. Florence Evelyn Cook then sold one share to the appellant's wife for $10.00. Therefore on February 24th, 1933, for a cash outlay of $129.26, Fillmore Cook, attorney for Florence Evelyn Cook throughout the transaction, and when she had no independent advice, had his interest in the real estate increased to one-half and the stockholdings of himself and his wife increased to fifty-one per cent. His wife also became a director in the corporation which then consisted of three directors, Mr. and Mrs. Fillmore Cook and Florence Evelyn Cook. He claims that he also secured a one-sided option to purchase for $20,000.00 the one-half interest of Florence Evelyn Cook.

He testified that he thought this transaction was fair to all of them and that Mrs. Evelyn Cook felt it was fair and was very grateful to him for making such an arrangement.

The so-called will was signed when the testatrix was at least weak in body, according to appellant's own testimony. The supposed option is sought not only to attach to the one-sixth interest bought from Mrs. Lula Cook but to the one-third interest previously owned by the testatrix. In other words, the testatrix became the owner of half of the realty and forty-nine per cent. of the stock all frozen by the option, when before that she had owned a one-third interest free of the option. Without the will the appellee would get the whole estate. The appellant not only drafted the will but suggested that the option be placed in it and also that he be appointed executor without bond and therefore it appears to be appellant's will rather than that of the testatrix. At appellant's

suggestion this one-sided option was given to purchase for $20,000.00 the testatrix's interest in properties and stock which yielded her during the last year of her life approximately $9,494.86. We further find that the appellant recognized that this option was not fair by the fact that he refused to give to the testatrix's daughter and only heir-at-law the same option as to the interest owned by him. The testimony of the appellant clearly shows that the transaction on its face was absolutely unfair to the client and in favor of her attorney. Under the instruction granted by the court, issue number one, the contents of the paper-writing were read to or by the testatrix *or* known to her at the time of the alleged execution thereof. This issue appears to be, not an issue as to understanding, but only the usual issue as to knowledge of contents. *Lyon v. Townsend*, 124 Md. 163, 190-191, 91 A. 704, and cases therein cited.

As pointed out by Judge Robinson in the case of *Griffith v. Diffenderffer*, 50 Md. 466, 486, 487, where a testatrix is of sound mind and capable of making a will and the will is read to and explained and approved by her, as appellant testified, under such circumstances as these, the law imputes knowledge and the door of inquiry is closed. He points out, however, exceptions to this rule in the preparation and execution of the will when it is alleged that fraud was practiced. It is evident from the testimony of the appellant himself that, although the will pretends to be a written expression of the oral contract, it does not express, under his own testimony, such oral contract.

Item II of the will provided that before the undivided interest in dispute shall be disposed of to others, it *shall first be offered for sale to the said Fillmore Cook, or in case of his death, to his widow, Catherine E. Cook, or in case of the death of both the said Fillmore Cook and Catherine E. Cook, to their daughter, Vivian Dorothy Cook, their heirs, personal representatives or assigns.* (Italics here.) According to appellant's own direct testi-

mony as hereinbefore set forth, the oral agreement made before February 24, 1933, provided *"that upon the death of her daughter, the property would be transferred to either myself, my wife or my daughter."* (Italics here.) Further, according to appellant's own testimony as hereinbefore set forth, when the testatrix explained to her daughter, Audrey, in the presence of the appellant, the terms of the oral agreement, she said that she agreed that she would *"not sell to anyone else except me or my wife or my daughter at any time * * * and that at the expiration of her death or her daughter's death, or the survivor, that that interest was then to be sold to me at that rate."* (Italics here.) He admitted on cross-examination that she never used the words—personal representatives, heirs and assigns. Therefore, neither the oral contract as recited by him nor the oral contract as recited by Mrs. Florence Evelyn Cook to her daughter, Audrey Louise Hollyday, the caveatrix, provided for the option to extend to the heirs, personal representatives, and assigns of Vivian Dorothy Cook, as provided in the second item of the will. Therefore, according to the testimony of the appellant himself, the attempted ratification of the oral contract in Item II of the will was not a correct ratification of that oral contract, but contained an important provision for the benefit of the attorney who drew the will, not contained in the oral contract and therefore should not be allowed to stand.

Incidentally, the price named in the will, $20,000, is $500 less than the price indicated in the appellant's testimony, *viz.,* the price at which the three interest had been bought. Forty thousand dollars was the price of the realty alone. The price of the stock was $1,000 in addition.

There is no question but that a confidential relationship existed between the parties and therefore the burden of proof was on the appellant to establish his version of the contract and the fairness of the contract by clear, satisfactory and convincing evidence, which, under his

own testimony, he has not done. *Rice v. Rice*, 184 Md. 403, 41 A. 2d 371, 375. If the evidence clearly shows such facts, that one in reason and fairness could find from it no other facts, the court ought not to submit the finding of such facts to the jury. *Griffith v. Diffenderffer, supra,* 50 Md. 466, 488, 489.

We must therefore conclude that according to appellant's own testimony, the court could properly have instructed an answer of "Yes" to the second issue.

As this decision is made upon the testimony of the appellant alone, it will not be necessary to discuss the exceptions to the evidence. Since the verdict was right on the second issue as a result of the failure of appellant to meet the burden of proof cast upon him it will not be disturbed and the verdict on that issue will be affirmed. *Bowman v. Little,* 101 Md. 273, 297, 61 A. 223. As the verdict on this issue of undue influence was correct, it will not be necessary that we discuss or pass upon the remaining issues as these did the appellant no injury and would not justify us in awarding a new trial. *State v. Baltimore & Ohio Railroad Company,* 69 Md. 339, 14 A. 685; *Norris v. Conn. Fire Ins. Co.,* 115 Md. 174, 180, 80 A. 960.

*Ruling affirmed.*