### HANCOCK v. SAVINGS BANK OF BALTIMORE ET AL.

[No. 77, October Term, 1951.]

164

*Decided January 11, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*A. Frederick Taylor,* with whom was *David P. Gordon* on the brief, for the appellant.

*John S. Hebb, III,* with whom were *Mullikin, Stockbridge & Waters* on the brief, for *Charles H. Taylor, Administrator,* appellee.

*L. Vernon Miller* on the brief for The Savings Bank of Baltimore, appellee.

MARBURY, C. J., delivered the opinion of the Court.

The question involved in this case is whether a paper, signed by Lula M. Duker, while in the Johns Hopkins Hospital, was sufficient to create a trust over her bank account in the Savings Bank of Baltimore. The paper was executed on July 31, 1950, and Mrs. Duker died on August 5, 1950. The appellant, who was the beneficiary of the attempted trust, filed a bill of complaint in the Circuit Court of Baltimore City against the Bank, and against the administrator of Mrs. Duker's estate, to have the court declare the account in the Savings Bank impressed with a trust in her favor, and to direct the Bank to turn the balance in the account over to her, after paying the decedent's final hospital and doctors' bills. The chancellor, after taking testimony and hearing argument, dismissed the bill of complaint, where upon the complainant appealed here.

Two questions arise in this case, the first being whether the purported order of transfer was sufficient in form to transfer the account, (the Bank declined to accept it), and the second, whether, if it was sufficient, the circumstances surrounding its execution show it was not the intention of Mrs. Duker to create a trust in the entire bank account in favor of the appellant.

The appellant was a cousin of Mrs. Duker, and was, according to the uncontradicted testimony of disinterested witnesses, the only relative who paid her any attention. Mrs. Duker was in her eighty-eighth year at the time of her death. For a number of years prior thereto, she had lived alone in a house she owned on East North Avenue in Baltimore. She was somewhat of a recluse. She formerly had a companion who lived with her for approximately twenty-three years. After the companion married, she called and went to see Mrs. Duker frequently. Mrs. Duker had two brothers, aged respectively 84 and 80, and a sister aged 82, but the

record does not show where they lived, and apparently (and perhaps naturally, on account of their ages) they never visited their sister. The appellant, according to the testimony of the former companion, started to visit her about 1943, and her visits gradually increased. She took over her affairs and the paying of her bills after the companion left, and Mrs. Duker talked about her constantly and depended on her. That is testified to, not only by the former companion, but also by a husband and wife who lived next door and who became acquainted with her about eight years ago. They started a garden in her back yard, with her permission, and at times asked about buying the place. Mrs. Duker told them that it was up to her cousin Ruth, meaning the appellant, that she was going to leave the property to her; she said that everything was left up to Ruth, and that when she died, it went to Ruth.

In July, 1950, Mrs. Duker fell and fractured her hip. The next-door neighbor was called over to the house, but Mrs. Duker refused to let the ambulance or the fire department take her to the hospital, until Ruth came. However, the latter could not be reached on the telephone, and finally Mrs. Duker was persuaded to go. She gave the keys and her pocketbook to the neighbor who went to the hospital with her, and told her to keep them until she got hold of the appellant and then to give them to the appellant, which the neighbor did. The appellant was of course barred by the evidence act from giving any testimony as to any transactions she had with the decedent, but she testified that, after going to the hospital and having certain conversations, she got two bank books from the cupboard in the decedent's bedroom. She took them both to the hospital, and then took them home with the keys. One was from the Eutaw Savings Bank, and after Mrs. Duker's death, she turned that and the keys over to the administrator representing the estate, but she kept the other bank book from the Savings Bank of Baltimore. She said she did this by instructions.

She put the order for transferring the account in the bank book and took both down to the Savings Bank of Baltimore the day after the order was signed. The Bank did not transfer the account, and the officials there instructed her that the blank in the form had to be filled out with the amount. She did not ask Mrs. Duker to have another one executed, because she was too sick.

The decedent was operated on at the Johns Hopkins Hospital by Dr. Hillman, and was then referred to Dr. McDonnell for her after-care. Both of these doctors were present when the purported transfer paper was signed, and both testified that Mrs. Duker's mind was clear and that her answers were direct and logical. Dr. McDonnell said to her: "We understand you would like to turn some money over to Miss Hancock." She replied: "Yes." Then both doctors held the patient up in bed and she wrote her signature on the paper, which was by her initials and last name only and was written quite shakily, slanting upward from the line marked on the paper for that purpose. Her eyesight was not good enough to enable her to see the line. Dr. Hillman said the slip which she signed was held in front of her at that time. He said Mrs. Duker did not in his presence volunteer any information as to funds and disposition, other than her answering "Yes" to the question of Dr. McDonnell. Dr. McDonnell said it was made clear to Mrs. Duker that she was signing over to Miss Hancock funds from her bank account. The written part of the paper, except the signature, was inserted by the doctor. The paper itself was on a form prepared by the Bank, entitled "Order for Transferring Account" and, as signed, it read as follows:

Baltimore 31 July 1950

THE SAVINGS BANK OF BALTIMORE

Transfer to a New Account in the Name of LULU M. DUKER In Trust For——Self And RUTH W. HANCOCK Joint Owners, Subject To Order Of Either; The Balance at Death of Either To Belong To The Survivor

———————Dollars With Interest In Full Settlement of Account No.———————

EDMOND J. McDONNELL
    Witness

        Sign Here L. M. DUKER

The nurse who looked after Mrs. Duker until her death testified that the appellant came to see her every day and constantly, and that Mrs. Duker was always asking questions about different matters concerning the house. She was not present when the transfer was signed, but she heard Mrs. Duker afterward asking the appellant whether the paper was all right at the Bank. She also asked the appellant: "Are you taking care of everything?" and the appellant said: "Don't you worry about a thing because everything will be all right." She also said, with reference to the paper, that Mrs. Duker asked the appellant if she had gotten it fixed all right, and the appellant said: "Well, we will take care of that." Dr. McDonnell said he had some conversation with the appellant about the payment of the hospital bills, and the appellant wanted to know if they should be paid at that time. He told her that the hospital did not operate on credit and it would be advisable for the bills to be paid if possible. The appellant indicated that Mrs. Duker had some money and perhaps that money could be obtained to take care of those bills. The Bank declined to honor the transfer because the amount was not specified, and the signature poor, but the officer testifying said it was not necessarily true that the full amount had to be written in. If the word "balance" was written in, that would be sufficient. There seems to be some question whether the Bank refused to accept the transfer because of the signature, or because the amount was not mentioned, but in any event, we do not think the Bank's refusal makes any difference. If the Bank had accepted it and transferred the account, the funds would not belong to the appellant any more than they do from her possession of the paper and

the bank book, and whether or not they do is a question for us and not for the Bank to decide.

Since *Milholland v. Whalen,* 89 Md. 212, 43 A. 43, 44 L. R. A. 205, generally known as the second *Milholland* case, it has been settled in this state that an account created by A in trust for herself and B, joint owners, subject to the order of either, the balance at death of either to belong to the survivor, is a trust, and the balance at the death of either belongs to the survivor, not by a gift and delivery of the bank book, not by the right of survivorship of one of two joint owners, and not by a gift of the funds *inter vivos,* but purely and exclusively because of the trust. The long line of subsequent cases is listed, and some of them are discussed in the recent case of *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 46 A. 2d 284. In *Ragan v. Kelly,* 180 Md. 324, 330, 24 A. 2d 289, 293, Judge Forsythe, speaking for the court, and referring to the *Milholland-Whalen* case, *supra,* said: "The general rule there adopted, and since followed, is that the entry, as it stands, is a sufficient declaration of a trust as it, unexplained, indicates an intention to create a trust. But the entry may be explained and the intention it indicates may be rebutted." The entry in the instant case is in the general form of that approved in the second *Milholland-Whalen* case, and must be so interpreted. It purports to transfer from Lula M. Duker an account in the Savings Bank of Baltimore into a trust account for Lula M. Duker and Ruth W. Hancock "the balance at death of either to belong to the survivor". Mrs. Duker had but one account in the Savings Bank of Baltimore, and the absence of any amount, or the absence of the number of the account, do not prevent the order from being effective as to the only account she had there. There is abundant evidence that she signed it, and, while the Bank cannot be criticized for being careful about accepting it, we think it was a properly executed declaration of trust with respect to the account, and was suffi-

cient to authorize the Bank to make the transfer to the trust form.

The execution of such a declaration of trust creates, as we have shown above, and as has been held in the many cases, a rebuttable presumption that it was the intention of the owner to create a trust over the bank account which, upon his or her death, will cause it to belong to the survivor. It is, however, always open to the executor or administrator of a decedent, or to others who may have a proper interest in an account, to show that the purpose of the declaration of trust was not what it, in form, appeared to be. That is the position taken by the administrator in this case. Before we reach that point, however, we have to consider the position of the appellant.

She undoubtedly occupied a confidential relationship with the deceased. She was her devoted relative, she looked after her affairs, she was called upon when anything had to be done, the deceased at first refused to go to the hospital until she was notified, and she acted in every respect as a confidential friend and relative would act. Under these circumstances, it is incumbent upon her to show that the transaction was fair and reasonable in all respects. *Upman v. Thomey,* 145 Md. 347, 125 A. 860. The testimony shows that the appellant was the only relative who paid any attention to her aged cousin, and the latter said repeatedly to the next-door neighbors, who were among the very few people who ever saw her, that she intended to leave her house to Ruth, and that Ruth would have to be consulted about its sale. Unfortunately, this intention, which could have been carried out by the execution of a will, was not wholly carried out, but the absence of such a will, under the circumstances, does not negative the expressed intention. This intention affords a substantial basis for holding that the action of the decedent was in furtherance of her own desire and wish. At the time of the execution of the transfer, there was a balance of $19,443.15 in the account, but the decedent

still owned her house. She had another bank account, the amount of which is not shown by the testimony, and she did not strip herself of the control of the account in the Savings Bank of Baltimore. In this respect, the case is unlike the case of *Henkel v. Alexander*, 198 Md. 311, 83 A. 2d 866. In that case, an elderly man put his entire property in the name of himself and his niece as joint tenants; thereby giving his niece an immediate opportunity to get half of it. While we did not find that he was mentally deficient, or that there was undue influence exerted upon him, we did find that the niece, who was in a confidential relationship with him, had not shown that the transaction was fair and reasonable. On its face, it was not. It is true there was some testimony in that case that the grantor had said that everything was to go to his niece, but this was not at all undisputed, and there was other testimony which indicated that the testator had said that he would not make a will because his property would all go to his half-brother anyhow. In the case before us, the testimony is uncontradicted and of the strongest possible nature, coming from disinterested witnesses who did not know the appellant, that the decedent did intend her real estate to go to the appellant, who was her favorite relative. She did not destroy her immediate control over the bank account, and did not strip herself of anything. We think the transfer was reasonable and in accordance with the expressed wishes of the deceased about her property.

The administrator, however, contends that the purpose of this transaction was merely to enable some hospital bills to be paid, and in substantiation of this fact, relies upon the testimony of Dr. McDonnell concerning his conversation with the appellant, and the conversation between the decedent and the appellant in the presence of the nurse when the appellant was asked if the bills had been taken care of. A presumption, as we have stated, is created by the execution of the transfer, and unless it appears that the decedent intended to do some-

thing else, a trust must be decreed over the entire account carrying it to appellant after the maker's death. In *Ragan v. Kelly, supra,* we held that a similar order, given by a seventy-nine-year-old man to his niece while he was in a hospital, was intended to and did create a special trust only for a definite and specific purpose, namely to pay bills, and that the trust came to an end upon the death of the maker. In that case, however, the testimony of the bank teller was that the niece went to the bank and said she needed money to pay his hospital and doctors' bills, and wanted to know how it could be arranged that she could make the withdrawal. He prepared the card which was signed by the depositor, there was no discussion about the papers at the time they were signed, and the niece testified that she intended to spend the money for him to the extent necessary. The bank account in that case was about $2,300.00, which was not greatly in excess of the amount which might be needed. In the case before us, the amount was far more than necessary for any immediate hospital or doctors' bills, and there is no testimony whatever that the transfer was made for that purpose only. We do not think that the fact that the appellant discussed with the doctor the payment of bills, and the fact that the decedent asked afterward if the bills had been paid, are sufficient to overcome the presumption that the decedent intended to accomplish the entire result which her signature to the transfer indicated was her desire. She may have wanted the hospital and medical expenses paid out of this account, and the appellant may have so understood. The appellant appears to be willing for this to be done. But this does not affect the final disposition of this substantial account, and the testimony does not indicate that the decedent intended any result different from that which her written order directed.

For these reasons, the decree of the chancellor will have to be reversed and the case remanded for the passage of a decree in accordance with the prayers of the bill. Inasmuch as one of these prayers intimates that the final

hospital and doctors' bills of the decedent are to be paid before the transfer is made, the chancellor will have to ascertain the amount of these, and, after deducting them from the amount on deposit, direct the Savings Bank of Baltimore to turn over the balance.

*Decree reversed and case remanded, costs to be paid by the estate of Lula M. Duker.*

HENDERSON, J., delivered the following dissenting opinion, in which DELAPLAINE, J., concurred.

It is conceded in this case that the complainant was in a confidential relationship to the decedent on account of the age, illness and complete reliance of the decedent upon her. Under such circumstances the universal rule is that the burden is upon the dominant party to show not only that the transaction is fair, but also that the transferor is fully informed and clearly understands the legal import of the paper signed. *Cook v. Hollyday,* 185 Md. 656, 668, 45 A. 2d 761; *Coburn v. Shilling,* 138 Md. 177, 199, 113 A. 761, and cases cited. Where the transfer is testamentary in its nature *i.e.,* to take effect upon death, considerations of fairness to the transferor are beside the point, for she parts with no present interest. Nor are considerations of fairness to the next of kin involved, for they would have no standing to complain if their expectations were wholly disappointed. But in all such cases the law is justly concerned with the possibility of imposition and overreaching, and imposes upon the dominant party the burden of showing affirmatively that the transferor has knowledge of the contents of the paper signed. The majority opinion in this case fails to state or glosses over this controlling principle.

There is no testimony that the decedent, after she entered the hospital with a broken leg, ever mentioned to anyone an intention to make a testamentary disposition of all or any part of her estate. The testimony that

in 1946 she had expressed the intention to will her house and other property to her attentive cousin, rather than to let it pass to her aged brothers and sister who were her next of kin, is not relevant to the present inquiry. Whether a trust has been effectually created "depends entirely upon the actual intention of the original owner of the fund at the time he had the entry in the bank book made". *Ragan v. Kelly*, 180 Md. 324, 331, 24 A. 2d 289, 293, quoted in *Bradford v. Eutaw Savings Bank*, 186 Md. 127, 135, 46 A. 2d 284.

The testimony shows that Mrs. Duker was concerned about the payment of her hospital bills. The hospital had asked for payment. The cousin told the doctors that the patient had funds to pay the bills, and procured an order to transfer from the bank. This order was not read to the decedent, nor was she able to read it; she could not even see the line where she signed but her hand was placed on it. Dr. McDonnell testified: "It was explained she was signing the paper to make funds available to someone else. * * * She was signing over to Mrs. Hancock funds from her bank account." The nurse testified that later Mrs. Duker inquired of Mrs. Hancock if the paper was all right at the bank. The bank had declined to accept the order because of the illegible signature and failure to specify the amount, but Mrs. Hancock did not say so. The nurse testified that Mrs. Duker "wanted to know if she had attended to the bills." Mrs. Hancock said everything would be taken care of. No one testified that Mrs. Duker was told that the paper contained a printed clause to the effect that the whole balance would belong to the survivor. So far from proving knowledge the complainant proved a lack of knowledge.

This court has often commented on the fact that banks habitually use this stock form to cover a variety of situations to which it is inappropriate. Text writers have argued that even in the absence of a confidential relation no presumption should arise from the execution of the paper itself. This court has said that it makes

**176**

a prima facie but rebuttable case. Here we have positive testimony in rebuttal that Mrs. Duker was not informed of the vital clause and could not read it. If any inference could be drawn, in the teeth of the evidence act, that Mrs. Hancock told her about it, the short answer is that the chancellor, who saw and heard the witnesses, did not draw it. His conclusion that she did not intend to give Mrs. Hancock more than a power of withdrawal to pay the bills is clearly supported by the weight of the evidence. I think the decree should be affirmed. Judge Delaplaine concurs in the views here expressed.