MOTOR VEHICLE SECURITY FUND, STATE OF MARYLAND *v.* ALL COVERAGE UNDER-WRITERS, INC. ET AL.

[No. 786, September Term, 1973.]

*Decided September 17, 1974.*

The cause was argued before MORTON, MENCHINE and MOORE, JJ.

*William J. Giacofci, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Norman Polovoy, Deputy Attorney General,* on the brief, for appellant.

*Gary A. Goldstein,* with whom were *Charles M. Tatelbaum* and *Schimmel & Tatelbaum, P.A.* on the brief, for appellee All Coverage Underwriters, Inc. *Ann M. Turnbull,* with whom were *Leonard E. Cohen* and *Frank, Bernstein, Conaway & Goldman* on the brief, for other appellees.

MOORE, J., delivered the opinion of the Court.

We are here presented with the conflicting claims of the Motor Vehicle Security Fund, State of Maryland (The Fund) and All Coverage Underwriters, Inc., a Florida Corporation (All Coverage) to the remaining assets in liquidation of the Olympic Insurance Company of America (Olympic). These assets are in the magnitude of $620,000. The claim of the Fund is in the sum of $432,865.63 and that of All Coverage is for $568,187.00.[1]

Olympic was established in 1958 as a domestic mutual insurance company, authorized to provide all types of indemnity insurance, except life insurance, and to reinsure any and all insured risks. The venture did not prosper. In March 1964 the company was examined by the State Insurance Department and was found to have a deficit in excess of $160,000. Beginning the following month and through December 1964, All Coverage advanced sums aggregating $460,000 in seven separate transactions, in each

[1]. Appellees Thomas and Merrill are assignees of certain of the Guaranty Certificates which form the basis of the claim of All Coverage. Their petition for leave to intervene in the proceedings was granted in the lower court.

of which Olympic issued a Guaranty Certificate for repayment of principal together with interest at 6%, out of surplus of Olympic.[2]

All Coverage provided new directors and new management. Its objective was, to be sure, the eventual return of Olympic to financial health. This did not occur. In September 1965 then Insurance Commissioner, Francis B. Burch, by a consent order in the Circuit Court for Baltimore City, was appointed as Rehabilitator of Olympic under Code, Art. 48A, and particularly §§ 141 and 145. Prior to the appointment of the Rehabilitator — more particularly effective June 1, 1965 — the General Assembly of Maryland created the Fund by adding § 482A to Art. 48A. We are told that the Legislature's action was "partially in response to the public outcry which accompanied Olympic's problems."[3]

The purpose of the law was to afford protection to claimants in motor vehicle accident cases where the insurer of the tortfeasor had become insolvent or otherwise unable to meet its insurance obligations. To be administered separately by the insurance commissioner, the Fund was made up of payments required to be contributed quarterly by *solvent* motor vehicle liability insurance companies in the amount of ¹/₄ of 1% of net premiums on policies written in the State of Maryland. It was authorized to pay "allowed claims" which could not exceed liability limits. As originally enacted, the Fund had no statutory right of subrogation.[4]

Upon the application of Mr. Burch as Rehabilitator, the court on June 15, 1966 entered an Assessment Order pursuant to the provisions of Art. 48A, § 260, upon the policyholders of Olympic. The amount of the assessment was equal to one annual policy premium on each policy held by the policyholders during a designated period of time. Dur-

---

**2.** These infusions of capital were, of course, credited to Olympic's surplus since otherwise they would operate to increase the company's debt and its existing deficit in surplus.

**3.** Brief of appellees Thomas and Merrill. Olympic was not alone. Two other insurance companies substantially engaged in motor vehicle liability insurance were also involved in delinquency proceedings.

**4.** By amendment effective July 1, 1970 to subsection g of § 482A, the Fund was made a subrogee to the claimants' full right of recovery against the insurer, its rehabilitator, receiver or conservator.

ing the period October 1, 1968 through July 31, 1972, assessments were collected in the gross amount of $476,429.46.

During the above inclusive period, on September 6, 1968, upon a Petition for Liquidation presented by Newton I. Steers, Jr., the then Insurance Commissioner (by Francis B. Burch his predecessor who had succeeded to the Office of Attorney General), it was specifically requested that Mr. Steers be appointed as Liquidating Receiver of Olympic pursuant to § 137 of Art. 48A. A Consent Order was entered by the court the same day, as was an Order for notice to creditors directing that all claims against Olympic be filed with the Receiver on or before August 30, 1969 or else be forever barred.

Some 277 claims were filed, based upon Olympic's automobile liability insurance policies. During the period November 4, 1970 through June 30, 1972, the Fund paid out of its own resources the total sum of $432,865.63 to some 264 of the aforesaid 277 claimants.

All Coverage filed its claims against Olympic on August 26, 1969. On September 3, 1971, the Administrator of the Fund made a claim of the Receiver for the sum of $411,316.91 which had been prepaid to claimants as of June 30, 1971. At that time, the Administrator asserted the Fund's claim in that amount against the assets of Olympic in receivership based upon the following:

"Subrogation of Motor Vehicle Security Fund in place and stead of claimants prepaid pursuant to Section 482A, Article 48A, Maryland Code, by said Fund as per attached statement, which is incorporated by reference herein."

A petition for authority to refer the entire matter to a court auditor was filed and granted on December 15, 1971. John P. O'Farrell, one of the standing auditors of the court, was designated. The petition for referral recited that approximately 90% of all automobile claims had been paid in full by the Fund and the only claimants still unpaid from the

receiver were those whose claims involved cases other than automobile and property damage. It was also stated that:

"The only claims that are presently unresolved, with the exception of less than 5 relatively inconsequential claimant claims, are the subrogated claim of the Motor Vehicle Security Fund and the claim of All Coverage Underwriters, Inc. for monies due them under their guarantee notes. The only other major question unresolved is the amount of court costs that must be paid to the Circuit Court of Baltimore City."

The auditor's report and account, with supporting exhibits, was filed with the court on October 10, 1972. The auditor found that as between the claim of All Coverage and that of the Fund, the claim of All Coverage should be honored in its entirety prior to any payment to the Fund. The report stated in part:

"Since the Motor Vehicle Security Fund did not have a contract right of subrogation, but rather, if any, a statutory right of subrogation which statutory right arose after the vested rights of All Coverage, if the Auditor were to allow the right of Motor Vehicle Security Fund under Subsection (g) over and above the right of All Coverage to the funds in the hands of the Receiver, that act would be unconstitutional since it would base its allowance on a statute which would impair the obligation of an existing contract. The Fund, under Subsection (g), does not have a legal right of subrogation and, therefore, shall be paid after the payment of All Coverage Underwriters, Inc. under its Guaranty Certificates."

On October 17, 1972, the then Administrator of the Fund, Ernest J. Meredith, acting for Thomas J. Hatem, the then Insurance Commissioner, filed exceptions to the report and a supporting memorandum.

On August 24, 1973, the lower court adopted an order

whereby the exceptions were overruled and the account was ratified and affirmed. The court found that the auditor's report and account was "prima facie correct" and that the exceptions filed by the Fund did not show that the auditor "was clearly erroneous or that he misapplied the law to his findings of fact." The order also contained the following paragraph:

"That after a review of the record and the file, and after hearing argument from all interested parties, and upon a re-review by the Court Auditor of all of the issues presented in the Fund's Exceptions at the request of the complainant and this Court, the Court agrees with the Auditor's findings of fact, which it finds conclusive on the issues raised in the Exceptions. . . ."

The specific findings of fact affirmed by the court were the following:

1. The Fund's claim was untimely because it was not filed by August 30, 1969, the last date specified by the court order for the filing of claims and because the Fund had even failed to file a contingent claim as authorized by Code, Article 48A, Section 160.
2. Olympic was insolvent prior to the effective date of the Motor Vehicle Liability Security Fund Act and thus Olympic was not even subject to the provisions of the Act "even though a single payment was made to the Fund."
3. That All Coverage had a vested contractual right which could not constitutionally be divested by a subsequent legislative act effective July 1, 1970 which gave the Fund a right of subrogation.

Appealing from that order, the Fund contends principally that upon three alternative and independent bases it is a subrogee with a prior right over All Coverage. They are:

1. The subrogation provisions added to the Fund

Act by Code, Article 48A, Section 482A (g), effective July 1, 1970 (Laws 1970, ch. 619).

2. The written agreements of release and assignment between the Fund and each claimant prepaid by the Fund.

3. Having made the payments to persons whose claims were properly allowed, the Fund is entitled to subrogation on equitable grounds.

For the reasons hereinafter stated we conclude that the findings below with respect to the insolvency of Olympic prior to the effective date of the Act were not clearly erroneous. However, we also hold that the Fund *is* entitled to subrogation under equitable principles and that the court below erred in making no finding as to whether or not the Fund possessed contractual rights of subrogation or assignment under the releases obtained from the respective automobile accident claimants.

I

First we approach the Fund's contention that it is subrogated to the rights of those claimants who filed timely claims with the Receiver, and have been prepaid by the Fund, by operation of the provisions of Md. Code, Art. 48A, § 482A, enacted as Chap. 912 of the 1965 Laws of Maryland, effective June 1, 1965, as amended by Laws 1970, ch. 619. Section 482A (b) created the Fund "for the purpose of securing the benefits under policies on account of claims from motor vehicle accidents," and specified that:

"Such fund shall be used in the payment of al-lowed claims of injured parties and policyholders under said insurance policies, remaining unpaid, in whole or in part, by reason of the insolvency or inability of the insurer to meet its insurance obligations where the insurer has made payments to the fund as required by subsection (c)."

Subsection (c) (2) of § 482A provided in pertinent part:

"For the privilege of issuing policies insuring

against legal liability arising out of the ownership, operation or maintenance of motor vehicles which are principally garaged in this state, and in addition to all other requirements of law, every insurer shall pay into the Fund on or before November 15, 1965, $1/4$ of 1% of its net direct premiums . . . as shown by the return hereinbefore required for the three months ending September 30, 1965. . . ."

Subsection (a) (4) defined "Insurer" to mean, in part, "any insurer other than an insolvent insurer. . . ." It is immediately apparent that the threshold question to be determined is whether upon the creation of the Fund, *viz.*, June 1, 1965, Olympic was a solvent insurer. If it was insolvent, it was not required to make payments to the Fund and the Fund was accordingly not obligated to pay unpaid claims under policies issued by Olympic. The Fund vigorously contends that Olympic was solvent on June 1, while appellees contend with equal force that it was not.

Article 48A, § 132 (1), "Impairment" or "Insolvency," states:

"The capital of a stock insurer or the surplus of a mutual or reciprocal insurer, shall be deemed to be impaired and the insurer shall be deemed to be insolvent, when such insurer is not possessed of assets at least equal to all liabilities and required reserves together with its total issued and outstanding capital stock and minimum surplus if a stock insurer, or the minimum surplus if a mutual or reciprocal insurer, required by this article to be maintained for the kind of insurance business it is then authorized to transact."

The record discloses that in March, 1964, Olympic was examined by the State Insurance Department and was found to be insolvent. As a result of the examination Olympic was notified that unless sums totaling $210,000 were deposited to its credit the company would be required to terminate its business and undergo liquidation proceedings. It appears

that the Insurance Commissioner was acting under Art. 48A, § 256 which provides in pertinent part:

"If the minimum surplus to be maintained under the requirements of § 49 ["Surplus assets or funds required"] becomes impaired, or the assets of a mutual insurer are less than its liabilities and the minimum amount of surplus required to be maintained by it . . . , the Commissioner shall at once determine the amount of deficiency and serve notice upon the insurer to make good the deficiency within sixty days after service of such notice.

\* \* \*

"If the deficiency is not made good and proof thereof filed with the Commissioner within such sixty-day period, the insurer shall be deemed insolvent and the Commissioner shall institute delinquency proceedings against it under Subtitle 10 of this Article. . . ."

As previously indicated, between April 2 and December 31, 1964 All Coverage Underwriters, Inc. advanced sums to the surplus of Olympic aggregating $463,000 in return for Guaranty Certificates. As part of the transaction new officers and directors were elected to Olympic's management by All Coverage. On January 15, 1965 Olympic entered into a Quota Share Reinsurance Agreement with the General Reinsurance Corporation of New York whereby, in effect, General Reinsurance assumed the risk of 80% of Olympic's business. Specifically the agreement provided that Olympic would pay the reinsurer 80% of the unearned premium reserve applicable to its net retained liability with respect to all business of Olympic in force as of December 1, 1964 and the same percentage of its net premiums written subsequent thereto, less a reinsurance commission allowance of $42^1/2\%$.

The reinsurance commission allowance, however, was expressly made provisional and subject to adjustment in accordance with a Commission Adjustment Formula which would have the effect of reducing the allowance

proportionally as Olympic's losses by reason of settlement of claims exceeded its premiums earned.

Olympic wrote $863,253 in automobile liability premiums during the period from January 1, 1965 through June 30, 1965. It further appears, and it is not disputed by the parties, that the company actually made a payment to the Fund for premiums written during July and part of August, 1965, although the amount does not appear in the record.

An examination of Olympic by the State Insurance Department in August, 1965 showed that the company was taking full credit for reinsurance commissions amounting to $342,297.53, notwithstanding their clearly provisional status. Indeed the commission adjustment formula had indicated that the entire amount of the reinsurance commissions would have to be returned to General Reinsurance if the ratio of losses incurred to premiums earned reached 97%, and the insurance examiner's report of August 17 indicated that the loss ratio for the period between January 1 and June 30, 1965 was 110.96%.

The Insurance Commissioner, therefore, again apparently acting pursuant to § 256, gave notice to Olympic on August 16, 1965 that the Insurance Department would allow no credit for the claimed reinsurance commissions and that with the disallowance of this item the company's surplus was entirely wiped out, required reserves were seriously affected and Olympic was insolvent. The company was ordered by the Commissioner to post additional reserves for claims for unpaid losses in view of this discovery and of its loss experience of the past two years.[5] When a demanded contribution to surplus was not forthcoming by noon of August 18, 1965 the Commissioner suspended Olympic's license to do business. On September 16, 1965, when the Commissioner filed a Petition seeking an Order appointing him as Rehabilitator of Olympic, he recounted the facts

---

5. Olympic's Annual Statement for the year 1964 shows that the company had a loss from underwriting of $224,889.02 and a net loss from operations of $217,569.85. The overall loss ratio on business written was 100.49% with specific loss ratios on automobile liability insurance of 119.25% for bodily injury and 104.71% for property damage.

essentially as heretofore set forth and listed two of the statutory grounds for such petition enumerated in Art. 48A, § 136, *viz.*, that Olympic

"(1) Is impaired or insolvent;

*   *   *

(11) Is found, after examination by the Commissioner, to be in such condition that its further transaction of business will be hazardous to its policyholders, bondholders, or to creditors or to the public."

The Consent Order appointing the Insurance Commissioner as Rehabilitator of Olympic declared *inter alia* that Olympic denied "all particulars of impairment and insolvency alleged in the Petition for Rehabilitation, . . . the parties agreeing that the ground for rehabilitation is that Olympic has been found, after examination by the Insurance Commissioner, to be in such condition that its further transaction of business may be hazardous to its policyholders, bondholders, or to creditors, or to the public. . . ." The *coup de grace* to Olympic's fortunes came on September 6, 1968 when the Petition for Liquidation was filed by the Insurance Commissioner under Art. 48A, § 137, alleging the statutory ground that the company

"(4) Is in such condition that further efforts to rehabilitate the insurer, upon any of the grounds specified in § 136 of this subtitle, appear to be futile."

A corresponding Consent Order appointing the Insurance Commissioner as Receiver to liquidate the assets of Olympic was signed by the Circuit Court of Baltimore City on the same date.

The Fund contends upon these facts that Olympic cannot be deemed to have been insolvent prior to mid-October, 1965, and that, therefore, the lower court was clearly erroneous in determining that the company "was insolvent . . . prior to July 1 [sic], 1965, which was the effective date of the Motor Vehicle Liability Security Fund Act. . . ." The Fund's

argument, essentially, is that the twin determinations by the Insurance Commissioner, in March 1964, and again on August 16, 1965, of Olympic's insolvency are put to nought by the more specific definition of insolvency in the very statute under which the Commissioner acted on each of these occasions. Section 132 (1), quoted *supra*, the Fund contends, is merely a general description of when an insurer is insolvent, while § 256, *supra*, which is concerned with deficiencies of mutual insurers in the particular situation where the deficiencies are demanded by the Commissioner to be made up by the insurer, "is obviously more specific" and "must govern and be treated as an exception to § 132 (1)," under the rule of construction that particular provisions prevail over more general ones where the two are inconsistent. Thus, the argument proceeds, while the Commissioner in March 1964, found Olympic to be insolvent, it would not in legal effect be considered insolvent until the expiration of sixty days after notification of the deficiency in its surplus and its corresponding failure to make up the deficiency, at which time — in the words of § 256 — "the insurer *shall be deemed insolvent* and the Commissioner shall institute delinquency proceedings against it. . . ." (Emphasis added.) But no such proceedings were instituted, presumably because of the infusion of capital by All Coverage; therefore, according to the Fund, Olympic was not, *in 1964*, insolvent.

In like manner, the Fund asserts, the Commissioner's finding of insolvency on August 16, 1965, could acquire no legally operative effect until mid-October but there intervened the Consent Order of September 16 incident to which there was no judicial finding of insolvency because the parties had agreed that the ground for rehabilitation was solely the "hazard" represented by Olympic's condition. Simultaneously, the management of Olympic was making a payment to the Fund, in evident support of its own conviction that it was still solvent.

We are compelled to agree with appellees that the Fund has taken a somewhat tortuous path here in an attempt to demonstrate, as it must, clear error by the lower court in its

determination of insolvency. We think, on the contrary, that "insolvency" as used in § 256, as generally in the insurance code, admits of no such restrictive meaning as the Fund would impose on it. As indicated, the procedures of § 256 are set in motion upon a finding that "the minimum surplus to be maintained . . . becomes impaired, or the assets of a mutual insurer are less than its liabilities and the minimum amount of surplus required to be maintained by it . . ." — that is to say, in precisely those circumstances constituting impairment of capital and insolvency of the insurer under § 132. Section 256 makes plain, however, that no *consequences* attach to this finding until sixty days after notification and the deficiency has not been made good, when the insurer "shall be deemed insolvent *and* the Commissioner shall institute delinquency proceedings against it. . . ." (Emphasis added.)

Section 256 thus describes *the procedure* to be followed by the Commissioner upon a finding of impairment or insolvency (as well as how the ultimate proceeding of delinquency can be averted by the insurer); it engrafts no qualification on the general definition of insolvency contained in § 132. Insolvency *vel non* remains a determination to be made by the administrative agency based upon the — commonly recognized — definition of insolvency in § 132; once that determination has been made, and the deficiency is not made up, delinquency proceedings must be instituted.

In the instant case, the Commissioner found in March 1964, and again in August 1965, that Olympic was insolvent. The second finding was based on the company's loss record of the prior two years, in particular upon its Annual Statement for 1964 showing a loss from underwriting of $224,889.02 and a net loss from operations of $217,569.85, and upon the discovery that after January 1965, it had begun improperly taking full credit for provisional reinsurance commissions totalling $343,297.53, disallowance of which had the effect of wiping out its entire surplus. As proof of the gravity of its condition in the Commissioner's view, the company was given but two days to post additional reserves

before its license to do business was suspended on August 18, 1965.

In the light of the Commissioner's conclusion drawn from this retrospective view of Olympic's condition, made barely six weeks after the creation of the Fund, the auditor found and the Circuit Court concurred that Olympic was insolvent at the time of the Fund's creation. We cannot say this conclusion was clearly erroneous. Unquestionably, in the court's view the fact that a "spot examination" of Olympic's finances made in August 1965, rather than shortly prior to the creation of the Fund, disclosed Olympic's insolvency was without significance: an examination at the earlier date could have disclosed no real difference in the company's condition. The inference compelled by the Commissioner's determination was that Olympic was insolvent *at least* as early as June 1, 1965.

In opposing this conclusion the Fund notes that Olympic in fact made a payment to the Fund and, moreover, denied its insolvency in the Consent Order of September 16 providing for its rehabilitation. But the considerations prompting Olympic to make payment to the Fund or the Commission to agree to delinquency proceedings on the "lesser" statutory ground that Olympic's further transaction of business would be hazardous to its policyholders, etc. are speculative and cannot, in our view, undo the Commissioner's factual determination in August of the company's insolvency. That determination was found persuasive by the lower court and, we conclude, properly so. Olympic was insolvent at the time of creation of the Fund. It was, therefore, not obligated to make payments to the Fund. And the Fund was not statutorily obligated to pay allowed claims remaining unpaid by reason of Olympic's insolvency. Consequently, the Fund's claim of a statutory basis for its right of subrogation must fail.

II

The Fund argues, however, in view of the debatable — and certainly by Olympic, debated — issue of Olympic's solvency *vel non* at the time in question, that "there was at least a

colorable obligation under statute for the Fund to pay allowed claims against Olympic," and moreover "there is nothing whatsoever to even suggest that the Fund in paying the claimants acted without honest belief that it was bound to do so or without good faith." Citing *Ragan v. Kelly*, 180 Md. 324, 24 A. 2d 289 (1942) the Fund thus argues that it is entitled to subrogation at least on equitable or legal, as opposed to statutory, grounds.

Subrogation, of course, as an equitable doctrine does not owe its origin to statute and none is required in order that it be recognized. *Maryland Trust Co. v. Poffenberger*, 156 Md. 200, 144 A. 249 (1929); *Schaeffer v. Sterling*, 176 Md. 553, 6 A. 2d 254 (1939). Legal subrogation was defined in *Maryland Title v. Kosisky*, 245 Md. 13, 225 A. 2d 47 (1966) as follows:

> "Legal subrogation (as distinguished from conventional and statutory subrogation) arises by operation of law when there is a debt or obligation owed by one person which another person, who is neither a volunteer nor an intermeddler, pays or discharges under such circumstances as in equity entitled him to reimbursement to prevent unjust enrichment."

Hence whether one may be legally subrogated depends on whether he was a mere volunteer and, if not, whether he is on equitable principles entitled to subrogation as against other claimants. *The Finance Company of America v. Heller*, 247 Md. 714, 234 A. 2d 611 (1967).

In *Ragan v. Kelly, supra*, a sick and elderly man caused the name of his unmarried niece to appear with his on his bankbook. She used money from the account to pay her uncle's hospital expenses, and later his funeral expenses. His estate brought suit to require her to account for all sums spent. The Court of Appeals determined that the uncle had created a special trust for a specific purpose, payment of the expenses of his illness, a purpose that came to an end upon his death. Hence his niece had no legal obligation to pay his funeral expenses and "technically . . . should account to the administrator for money spent after Mr. Kelly's death. . . ."

But, the Court said, "it would be a great injustice to require her to do so."

> "Those were debts against the estate, and properly payable by the administrator. But when she paid them, Miss Ragan was acting in perfect good faith, and we have not the slightest doubt but that she conscientiously believed it was her duty, in accordance with the duty imposed upon her when the arrangement with the bank was made for her to draw on Mr. Kelly's account. . . . Since she paid only just and reasonable bills, which the administrator would have been compelled to pay, and out of the very same fund, she should be subrogated to the rights of the undertaker and the doctor in the settlement of the estate. . . ."

The Court declared:

> "*Subrogation always will be granted when an equitable result will be obtained.* 60 C. J., Sec. 22, p. 709. *Payments made in ignorance of real facts cannot be said to be voluntary. A person who has paid a debt under the colorable obligation to do so, or under an honest belief that he is bound, or who mistakenly but in good faith believes he is liable, will be subrogated.* 60 C. J., Sec. 27, on page 719, also Sec. 36, on page 725.

> "This is not a case of a mere volunteer, who, without any duty, moral or otherwise, pays the debt of another, but it is a case of *a person intrusted with a special duty, who, in the discharge of that duty, pays debts she honestly thought she should pay. In a case like this she is entitled to be subrogated to the rights of those whose claims have been paid.* 25 R.C.L., Sec. 53, p. 1370. There is no question here that the administrator could have been compelled to pay the debts, or that it is his duty to reimburse another who, under such circumstances, has paid them. 60 C. J., Sec. 26, p. 712." (Emphasis added.)

Similarly, in a federal case, *Dampskibsaktieselskabet v. Bellingham Stevedoring Co.*, 457 F. 2d 889 (9th Cir. 1972) where ship charterers paid demurrage in the apparently mistaken but good faith belief that they were obligated to do so, the Circuit Court of Appeals stated:

> "The district judge found that this belief was a reasonable interpretation of the terms of the charter-parties and that *a reasonable good faith belief that one is obligated to pay is sufficient for application of the equitable doctrine of subrogation.*
>
> "*We agree. The good faith standard follows from the liberal policies behind the doctrine of subrogation.*" (Emphasis added.)

In *Maryland Title v. Kosisky, supra,* the Court of Appeals quoted from *Restatement, Restitution* § 162, comment b, as follows:

> "Where a person discharges an obligation owed by another, or a lien upon the property of another, and does so officiously, he is not entitled to reimbursement from the other * * *, and is not entitled to be subrogated to the position of the obligee or lien-holder."

Section 2, comment a, defines officiousness to mean "interference in the affairs of others not justified by the circumstances under which the interference takes place." To confer a benefit upon another does not entitle one to reimbursement (or subrogation) "unless the one conferring the benefit had a valid reason for so doing."

Appellees insist that the Fund had no such reason to pay the claimants of Olympic, that its interference was officious in the sense defined and that it cannot claim to have paid in "ignorance of real facts" (*Ragan*) when the true facts of Olympic's condition at the time the Fund was established were known (or ought to have been known) to above all others the administrators of the Fund, who "were sophisticated in matters of insurance as well as law." We find this argument unpersuasive and we hold that the Fund was not a volunteer in paying the claims against Olympic.

There can be no serious contention that the Fund intended the payments either as a gift to the claimants or by way of a gratuitous discharge of Olympic's obligations. The Fund paid the claims only after the Legislature had amended § 482A in 1970 [6] to grant the Fund an express statutory right of subrogation, viz:

> "[§ 482A (g)(1)] Upon payment to any claimant under subsection (b) the fund shall be subrogated to the claimant's full right of recovery against the insurer, its rehabilitator, receiver or conservator."

We observe, parenthetically, that the lower court erred in finding that this amendment was an unconstitutional interference with vested rights as it applied to the rights of appellees to Olympic's assets. Since the Fund gave notice that it was not filing original claims but as subrogee "in place and stead of claimants [who had filed timely claims] prepaid pursuant to Section 482A," the deadline of August 30, 1969 for filing of claims against Olympic could not of itself operate to defeat the Fund's claim. The rationale of the cases cited by appellees for the principle that such a cutoff date is mandatory and operates to "vest" the rights of those having filed claims within the prescribed time is that a contrary rule would permit continuous enlargement of the debt of the company in receivership, to the detriment of registered creditors, and would unreasonably delay the date of final distribution. Neither, however, could ensue as a result of the Fund's filing as subrogee. The subrogee is merely "put in all respects in the place of the party to whose rights he is subrogated." *Poe v. Philadelphia Casualty Co.*, 118 Md. 347, 352, 84 A. 476 (1912). Subrogation operates "as an assignment in equity of the debt and all legal proceedings upon it. . . ." *Wallace v. Jones*, 110 Md. 143, 146, 72 A. 769 (1909). Equity, in applying the doctrine of subrogation, "looks not to form, but to the substance and essence of the transaction. It looks to the *debt* which is to be paid, *and not to the hand which may happen to hold it*, and will see that

6. Chapter 619 of Laws 1970.

the Fund charged with its payment shall be so applied." *Orem v. Wrightson*, 51 Md. 34, 46 (1879). (Emphasis added.) The Fund's claim here substituted a new "hand" only; it neither increased the size of Olympic's debt (substituting only a new payee) nor postponed the date of distribution of its remaining assets. Thus it interfered with no vested rights.

That the Fund intended no gift in paying the claims against Olympic does not by itself mean the Fund was not a volunteer, since one may be a volunteer even "where he intended to obtain reimbursement from the other [whose debt he has paid], if the payment was officiously made." *Restatement, Restitution* § 162, *supra*. Here, the Fund paid out to the claimants in the mistaken but undisputedly good faith belief that payment was justified by the circumstances and that it was bound, by the legislation creating it, so to act. In 1966 the Insurance Commissioner had asked the Attorney General for an opinion as to whether "the use of fund monies is affected by rehabilitation or receivership proceedings instituted prior to the fund's creation and whether the insolvent insurer must have previously made payments to the fund in order for a claimant to be eligible for benefits." The Attorney General replied (51 Op. Att. Gen. 108) that:

> ". . . insurers undergoing rehabilitation or receivership prior to the creation of the fund would be ineligible where they wrote no business and therefore made no initial payment to the fund for the period of June, July and August, 1965. Claims under policies involving a company in rehabilitation during this period which wrote business, filed the required report [under § 482A (c)] and made at least one payment, would be eligible. It is our opinion that the affected insurer must have made at least one payment in order for a claimant to be eligible for benefits from the fund because of . . . subsection (b)."

The Attorney General was, therefore, of the opinion that

claims under policies issued by an insolvent insurer undergoing rehabilitation or receivership prior to or at the time of the Fund's creation but who continued to write business and "made at least one payment" to the Fund based upon the initial reporting period were eligible for payment out of the Fund. We note, as indicated earlier, that Olympic wrote premiums in 1965 through June 30 aggregating in excess of $800,000, that formal rehabilitation proceedings were not commenced against it until September 16, 1965 and that it made a payment to the Fund for business written during a part of the initial reporting period. While these considerations, as we have concluded, do not alter the fact that Olympic was insolvent at the creation of the Fund, and, therefore, technically was not within its coverage, when coupled with the advice of the Attorney General they are entirely relevant to the question of a "colorable obligation" of the Fund and of an honest but mistaken belief on its part that it was required to make the payments. We disagree with All Coverage that the Fund's "ignorance of real facts" constituted negligence so as to strip it of the right of subrogation. *See* 73 Am.Jur.2d Subrogation § 19 ("Inexcusable neglect of the party seeking subrogation may bar relief.") In *Restatement, Restitution,* § 142 (c), "Fault," it is said: "If either the claimant or recipient has failed to use care to ascertain relevant facts, such person is at fault within the meaning of this Section." Resort by the Fund to the office of the Attorney General and reliance by the Fund on the opinion of the Attorney General is surely a demonstration of care so as to excuse its mistaken determination that it was under a duty to pay Olympic's claimants. We conclude that the Fund was not a mere volunteer or intermeddler, and that its entitlement to subrogation turns upon the remaining question whether subrogation would displace an intervening right or overthrow a superior or equal equity possessed by the appellees. *Milholland v. Tiffany,* 64 Md. 455 (1886); 50 Am. Jur., Subrogation, § 13.

Messrs. Thomas and Merrill, as the assignees of certain of the claims of All Coverage, occupy of course the same

position of priority *vel non* as the latter. The Guaranty Certificates issued by Olympic to All Coverage provide *inter alia*:

"... that the payment of interest and the repayment of principal ... shall be payable only out of the surplus of the Olympic Insurance Company of America remaining after providing for all reserves and other liabilities of the Olympic Insurance Company of America, and shall not otherwise be a liability or claim against The Olympic Insurance Company of America or any of its assets. ..."

This provision merely echoes the compulsory requirement of Art. 48A, § 266:

"(a) Any director, officer or member of any stock or mutual insurer or any other person, may loan or advance to such insurer any sum or sums of money necessary for the purposes of its business, or to enable it to comply with any surplus requirements, or any other requirements of the law, and such moneys ... shall be payable out of the surplus remaining after providing for all reserves and other liabilities, and such advance shall not otherwise be a liability or claim against the insurer or any of its assets."

The reason for requiring such loan or advance to be credited to surplus is evident, *see* n. 2, *supra*. The plain consequence of the provision, however, is that appellees are subordinated to the claims of those who filed claims with Olympic's receiver prior to August 30, 1969. Subrogation by the Fund to the rights of those claimants thus interferes with no superior legal right of appellees. We are satisfied also that it disturbs no equal or superior equity in appellees. All Coverage observes that "if given priority, [it] stands simply to recoup its investment — that is, to recover actual dollars which it advanced." While this would not be a "windfall at the expense of the State of Maryland," we are constrained to

point out that All Coverage was aware of the status imposed on it by § 266 at the time of its investment in Olympic. Unquestionably it weighed the risk of possible deferred creditor status upon liquidation of the company against its expectation of restoring Olympic, under new management, to a profit-making venture. Moreover, at the time of the investment the Fund was not in being and All Coverage could have had little reason to expect that the Fund would enter upon the scene to pay claims against Olympic, let alone that it would do so gratuitously without reserving a right of subrogation. As in *Ragan, supra,* had a third party not stepped in, those claims would have been payable from the assets of Olympic, including the monies advanced by All Coverage. We can only conclude that All Coverage, an apparently sophisticated investor, made the investment in Olympic with its eyes wide open — a business judgment that was shown by subsequent events to be unfortunate. This mistake in judgment does not, however, give rise to an equity superior or equal to that of the Fund. We hold that the Fund, on principles of legal subrogation, is entitled to reimbursement from the assets of Olympic for claims filed with the receiver by August 30, 1969 and prepaid by the Fund purporting to act in accordance with Art. 48A, § 482A.

### III

While we have determined that the Fund's claim to a right of subrogation under the principle of equitable subrogation must be sustained, we find it appropriate to comment also upon the legitimacy of its additional claim of subrogation, pressed with equal vigor, based upon the Fund's alleged possession of written assignments of all rights under the claims against Olympic which it prepaid.

Both appellees claim that the question of "conventional" subrogation by virtue of contractual assignment is not before us. It is asserted by appellees Thomas and Merrill that the question of assignment was not presented either to the auditor or to the court. The specific contention of All Coverage is this:

> *"The Fund failed to place the alleged assignment*

*in the record before the Court Auditor when the case was before him the first time.* The Fund failed to introduce the alleged assignments when the case came for hearing before Judge Cardin.

"The record before this Court, therefore, discloses that both the Auditor and the lower court did not have before them any executed assignments of claims. *They only had the claims by the Fund purportedly filed pursuant to very definite statutory authority, on the basis of a legislative granted right of subrogation in Annotated Code of Maryland, Article 48A, Section 482A, subsection (g)."* (Emphasis in original.)

In our view, this position cannot fairly be justified by the record before us. The auditor's report and account which has given rise to this appeal made an affirmative finding that "... the Motor Vehicle Security Fund did not have a contract right of subrogation, but rather, if any, a statutory right of subrogation which arose after the vested right of All Coverage...." This finding was sharply challenged in the Fund's exceptions to the report and account and in its supporting memorandum, which stated:

"It is quite clear, however, that the only claim that the Fund has to the proceeds remaining in the hands of the Receiver is one founded on subrogation alone under Section 482A (g) *and the assignments executed by each claimant as his claim is paid by the Fund (see blank copy of assignment form attached).* Since Maryland is a state which recognizes the right of full subrogation, then every subrogee is subrogated to all of the rights, remedies and legal procedures available to the underlying claimant. *See Wallace v. Jones,* 110 Md. 143 (1909); *Orem v. Wrightson,* 51 Md. 34 (1879); and *see* general discussion in 50 Am. Jur. 'Subrogation' §§ 110 and 125." (Emphasis added.)

And again, the Fund pointed out in its memorandum:

"The right to subrogation arises at the time that

the payment to the claimant is made and it is at that point that the Fund becomes substituted completely to claimant's status not only by operation of Section 482A (g) *but also by written assignment of claim.*" (Emphasis added.)

The "blank form" referred to in the language first above quoted is captioned "Release, Receipt and Assignment." Paragraph 2 is plainly and simply a legal assignment and states:

"Assign to the Motor Vehicle Security Fund all claims and judgments against the Olympic Insurance Company of America in Liquidation, and against any other persons, corporations, or organizations, relating to the claims and judgments referred to in Paragraph #1 hereof. *It is the intention of this assignment, that hereafter the Motor Vehicle Security Fund shall be subrogated to the undersigned's rights, claims and judgments as more fully set forth in Paragraph #1 hereof.*" (Emphasis added.)

All Coverage brushes aside the "blank forms" and tells us that neither the auditor nor the court had any "executed assignments" of claims before them. We find this inaccurate and somewhat disingenuous. The auditor expressly made a part of his report a series of 7 exhibits, including, as Exhibit No. 1, a complete list of claimants under Olympic policies who had been paid by the Motor Vehicle Security Fund; and, as Exhibit No. 5, "a list of claimants who have not been paid for their claims [and] . . . in each instance why these claims have not been paid." The explanation for the Fund's non-payment of Claim No. 260 in the amount of $100 is as follows:

"Note: The Motor Vehicle Security Fund was unable to secure releases. Therefore, the claim was not paid."

Again, claims of individuals numbered 178 through 182,

inclusive, aggregating $1,700 were not paid and the following reason is assigned:

"Note: The above claimants have not filed releases or claims with the Motor Vehicle Security Fund."

And the explanation given for the non-payment of Claim No. 153 is:

"Note: Releases have not been signed and the claim has not been paid by the Motor Vehicle Security Fund."

While the term "releases" employed in the above explanation could, of course, apply to instruments other than that used by the Fund as a "Release, Receipt and Assignment," it would severely and unreasonably strain one's credulity to suggest that the auditor was not aware that the Fund was requiring precisely these executed documents.

Furthermore, in our independent review of the record below, we note that a proffer was made to the court itself, on July 3, 1973 — prior to its final Order dated August 24, 1973 — in a motion by the Fund for remand to the auditor or for a hearing in open court to consider additional evidence. The Attorney General stated in this motion:

"(b) The Auditor found that 'the Motor Vehicle Security Fund did not have a contract right of subrogation' (Auditor's Report, p. 10), *when there are, in fact, duly signed and executed agreements, each entitled 'Release, Receipt and Assignment', by and between the Fund and each and every original claimant against Olympic which the Fund had paid, which agreements were not considered by the Auditor,* and for which agreements there was neither actual opportunity after notice, nor apparent reason for their presentation, introduction and submission as evidence." (Emphasis added.)

The justification for the Attorney General's representation that no formal opportunity was afforded by the auditor for the introduction and submission in evidence of the "Release, Receipt and Assignment" appears earlier in the motion for remand wherein it is charged:

"... [A]t no time did the Auditor, pursuant to the requirements of Rule 595, Maryland Rules of Procedure, assign a time and place for proceeding, or give notice thereof to the parties, nor did he examine any of the parties or any witnesses, nor did he require the production of all books, papers and other documents applicable to the issues which he had taken up."

For reasons *not* stated in the Court's Order nor elsewhere explained in the record, the motion of the Attorney General was never decided. We note that it was filed after brief proceedings in open court on June 21 and again on June 22, 1973 when the court heard counsel for the respective parties, as well as for the auditor, with respect to the exceptions to the auditor's report. The transcript of the court proceedings on June 22, 1973 reveals the following colloquy between the court and the Assistant Attorney General representing the Fund, pertaining to the presence of the auditor at the proceedings in court on the previous day:

"THE COURT: Let me say this, Mr. Giacofci, you made reference to the fact you did not care to call on Mr. O'Ferrall this morning. If I recall our discussion yesterday, when I spoke with all Parties involved and indicated that I would suggest that Mr. O'Ferrall be called in order that you might submit to him certain information that you had, I believe in your discussion you indicated to this Court that you would be willing to abide by his decision if you were given an opportunity to present these facts to him. You felt that they were not considered when he presented or completed his report. It was for that reason that I asked him to come over. Apparently you had no [an] opportunity

to discuss some matters with him this morning and when you were informed that he made an individual search before rendering his report you had a change of heart and you are not willing now to abide by his decision, is that what I understand?

"MR. GIACOFCI: Your Honor, I have some information that was not submitted to the reporter [auditor]. I strongly feel that there has not been a full hearing on the merits of these claims. Part of that is because of arrangements and agreements that were made between Counsel prior to my taking on this assignment.

"THE COURT: I had him here this morning for that purpose, did I not?

"MR. GIACOFCI: Your Honor, Mr. Tatelbaum would oppose . . .

"THE COURT: I was not interested in what Mr. Tatelbaum was opposed to. I called him here specifically for one reason, that you might submit any information that you thought had not been submitted to him at that time.

"MR. GIACOFCI: Your Honor, I wasn't aware that is why Your Honor had decided. I did not fully understand the reason for Mr. O'Ferrall's being here. I have information that I would like to submit but it would require reopening the case.

"THE COURT: I assume that the information you have to submit is in your memorandum?

"MR. GIACOFCI: Yes, it is, Your Honor.

"THE COURT: All right. You are submitting the memoranda to me, each Party?

"MR. GIACOFCI: Yes, Your Honor.

"THE COURT: I shall therefore discuss this report with Mr. O'Ferrall together with the memoranda I have received and unless I can find that he was clearly erroneous or that he misapplied

the law to his findings of facts, I shall certainly have to go along with his recommendation, but I will await your memoranda. Now, do you have it? "

The Order overruling the Fund's exceptions explicitly states that the auditor made a "re-review . . . of all of the issues presented in the Fund's Exceptions at the request of the complainant [sic] and this Court, [and] the Court agrees with the Auditor's findings of fact. . . ." The Court did not, however, make any reference to the auditor's finding, as to which a *specific* objection had been filed by the Fund, that the latter had no right of conventional subrogation. Its failure to do so we consider a substantial error of omission. If this omission was predicated upon any notion of insufficiency of evidence pertaining to "executed assignments," it would have been an abuse of judicial discretion not to have called for the submission of such evidence when its availability was clearly indicated in the Fund's exceptions and, indeed, apparently acknowledged by the auditor in his report. If the court concluded that the Fund's possession of executed assignments was immaterial, such a holding would have been clearly erroneous.

It is basic law that, even where a contract itself may not be assignable, the right to receive money due or to become due under an existing contract may be assigned. 6 Am.Jur.2d, "Assignments," § 16. The assignee takes the subject of the assignment with all the rights and remedies possessed by or available to the assignor. *Idem* at § 102. So, in Maryland, a debt which has actual or potential existence is the proper subject of an assignment, *Seymour v. Finance & Guaranty Company,* 155 Md. 514, 142 A. 710 (1928), the assignee ordinarily acquiring all the rights against the debtor that were possessed by the assignor at the time of the assignment. *Spiker v. Nydegger,* 30 Md. 315 (1869). The effect of an assignment is, in substance, the same as that of subrogation, conventional subrogation, indeed, having been treated as synonymous with an assignment. *See* 3 Md.L.Rev. 201, 216 (1939). As stated in *Wallace v. Jones, supra,* subrogation operates "as an assignment in equity of the debt and all legal proceedings upon it. . . ."

Appellees' challenge to the Fund's claim of conventional subrogation is based chiefly on the contention that the issue was not presented to the auditor or to the lower court, and hence was not preserved for appellate review.[7] This contention, we have concluded, is erroneous. However, the record before us does not permit the resolution of this issue as an additional basis for reversal, since there has been no formal proof of the executed assignments. Were this the only basis for reversal, a remand for the limited purpose of receiving such formal proof would have been necessary.

> *Order overruling exceptions to auditor's report and account reversed; cause remanded for entry of judgment for Motor Vehicle Security Fund in accordance with this opinion; costs to be paid by appellees.*

---

7. Appellees' additional contention that the Fund, a creature of statute, can have no right of subrogation except as expressly conferred by statute is supported by reference to cases involving workmen's compensation and the Unsatisfied Claim and Judgment Fund, cases whose rationale is inapposite here. *See* Baltimore Transit Co. v. Harroll, 217 Md. 169, 141 A. 2d 912 (1958) and American Motorists Ins. Co. v. Thompson, 453 P. 2d 164 (Or. 1969). The reason for denial of subrogation in such cases (absent a statutory provision) is a concern to protect the full right of recovery of the original claimant for his injuries. Here, the claimants against Olympic have been paid in full by the Fund and subrogation can in no way affect their rights.